336 So.2d 1006 (1976)
Clarence FONTENOT et al., Plaintiffs-Appellants,
v.
Donald SOILEAU, Defendant-Appellee.
No. 5548.
Court of Appeal of Louisiana, Third Circuit.
August 20, 1976.
Rehearing Denied September 20, 1976.
*1007 White & Pitre by Joshua J. Pitre, Opelousas, for plaintiffs-appellants.
Donald Soileau, Mamou, for defendant-appellee.
Before DOMENGEAUX, GUIDRY and BERTRAND, JJ.
BERTRAND, Judge.
This is a suit for personal injuries sustained by plaintiff's minor son when he fell from or was thrown from a horse owned by defendant. The defendant filed a motion for summary judgment which was granted and plaintiff has appealed. We affirm.
The allegations set forth in the petition are summarized as follows: that on November 14, 1974, plaintiff's minor son, Mitchell Fontenot, was employed by defendant to exercise his horses and do other odd jobs; that while Mitchell was riding defendant's horse, it began to buck and became uncontrollable, throwing Mitchell to the ground, causing him very severe injuries; that defendant knew of the dangerous propensities of this particular animal, yet failed to warn and advise Mitchell of these propensities, but instead had [sic] him to believe that the animal was gentle. Defendant contends that the deposition of Mitchell Fontenot shows that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.
Mitchell's father filed an affidavit in opposition to the motion for summary judgment stating that the defendant did know that the horse which caused Mitchell's injuries had vicious and uncontrollable propensities and that the same was never revealed to Mitchell. Furthermore, in his affidavit, Clarence Fontenot stated for the first time that, as owner of the horse which caused Mitchell's injuries, defendant is strictly liable for the damages caused by his horse. Therefore, the two issues to be resolved are (1) whether defendant is strictly liable to plaintiff for his injuries, and (2) whether defendant was guilty of negligence which proximately caused Mitchell's injuries.

I. STRICT LIABILITY
Plaintiff contends that the present case is governed by the holding in Holland v. Buckley, 305 So.2d 113 (La.1974). The *1008 Supreme Court summarized its holding therein as follows:
"We hold, therefore, that the correct interpretation of Civil Code Article 2321 is as follows: When a domesticated animal harms another, the master of the animal is presumed to be at fault. The fault so provided is in the nature of strict liability, as an exception to or in addition to any ground of recovery on the basis of negligence, Article 2316. The owner may exculpate himself from such presumed fault only by showing that the harm was caused by the fault of the victim, by the fault of a third person for whom he is not responsible, or by a fortuitous event."
We agree with the trial court that Holland is distinguishable from the present case. As stated by the court in Holland:
"The underlying reason for the owner's liability is that, as between him who created the risk of harm and the innocent victim thereby injured, the risk-creator should bear the loss. He maintains the animal for his own use or pleasure."
In Holland, the victim of the dog-bite was an innocent bystander. In the instant case, plaintiff was paid to do a job which encompassed the precise risk of harm that befell him, i.e., being thrown from a horse. The deposition of Mitchell, the person in the best position to know, supports the conclusion that nothing unusual happened to cause the horse to behave as he did, and that such behavior can be expected from horses when they want to run and are held back by the rider. The deposition further establishes that Mitchell had exercised race horses at a track for three (3) months prior to working for defendant, and had been working with defendant's horses for three (3) months prior to the accident. Under the facts of this case, Mitchell, an experienced rider who was used to working with race horses, was more a consenting victim than an innocent victim.
The following quotation from Holland, supra, presents a further ground of distinction:
"Article 2321 places the master of the animal under a legal obligation to keep his animal under such guard that it does no damage to others. A fault in this obligation to control the animal and guard others from harm by it entitles the victim to recover damages thereby sustained."
This rule of law is inapplicable to the instant case. Here, the horse was under the care, custody and control of the "victim," Mitchell, and not the defendant-owner. What occurred was a natural and ordinary risk of his employment as is evident from Mitchell's own testimony. Nothing to the contrary was even suggested by way of opposition to the motion for summary judgment.

II. NEGLIGENCE
Holland v. Buckley, supra, states that the owner's liability under Article 2321 is, "as an exception to or in addition to any ground of recovery on the basis of negligence, Article 2316." This article provides that, "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." A comprehensive summary of the decisions wherein the fault or negligence of the owner was at issue is contained in the case of Holland v. Buckley, supra. In Holland, Justice Tate noted that these decisions fall into three main categories: (1) those which allow the victim to recover from the animal owner upon proof of the dangerous propensites of the animal and the owner's presumed knowledge thereof; (2) those which hold that the harm caused by the animal creates a presumption of fault on the part of its owner, which places a burden upon the owner to show that he is free from even the slightest fault; and (3) those which hold that, in order to recover damages caused him by the accident, the victim has the burden of proving both the existence of a dangerous propensity of the animal inflicting the injury and also knowledge of such propensity on the part of the owner.
We realize that the cases cited as illustrative of these categories were overruled in Holland, but it is our understanding *1009 that these cases were overruled only insofar as they represent incorrect judicial interpretations of Civil Code Article 2321. Apparently, they are still viable at least for the purpose of providing guidelines for the determination of whether a defendant is negligent under Article 2316.
After reading the deposition offered in support of the motion for summary judgment, we are convinced that the plaintiff has failed to show that the defendant is guilty of any fault whatsoever. In his deposition, Mitchell Fontenot stated that he had been riding horses for about five (5) years (since he was about twelve years old) and began riding horses for pay when he was sixteen (16) years old. His first employment was at Evangeline Downs where he worked as an exercise boy. His answers to the deposition questions show that he knew how to handle horses and was aware that race horses are more spirited and move more quickly than other horses. After three (3) months at Evangeline Downs, Mitchell went to work for the defendant, who owned several racing quarter horses. He had worked for the defendant for three (3) months before he fell from the horse. As part of his employment, Mitchell would gallop the horse he fell from, as well as other horses belonging to the defendant, about twice a week. During his employment he saw the defendant only twice and saw the defendant in the area where the horses are kept on only one occasion. He and the defendant never discussed the horses. Mitchell worked with the horses each day. He fed them, led them to the electric walker wheel, and, unless there was someone to help him, he saddled the horses by himself. The record supports Mitchell's statement that he knew the horses better than the defendant did.
Mitchell testified that Beggar's Image, the two year old stallion he fell from, was "a normal horse," and as gentle as the other horses. He never complained about the behavior of Beggar's Image. The testimony relating to the accident itself is as follows:
"Q What time of the day was this?
A It was about 7:30.
Q In the morning?
A Yeah.
Q Was the sun shining?
A A little.
Q It was daylight?
A Yeah.
Q Your daddy put you on the horse near the barn?
A Yes, sir.
Q And then what happened?
A Well, I led him to the track.
Q You rode him to the track, you didn't actually lead him? To me, lead him would mean you were walking in the front?
A I rode him to the track.
Q You rode him to the tracko.k.?
A And he was galloping.
Q You were galloping him?
A Yeah, and when I made this turn, he started acting up. Playing with his head, and doingyou know, acting up. He started going good again and he started playing with his head and he lugged in.
Q He lugged in?
A Yeah.
Q And about how far after he had played with his head that he lugged in that you fellabout how far from?
A Well, he started playing with his head in that turn.
Q In the turn?
A Yeah, and when I got straight, he started playing with it again and that is when he turned . . .
Q He turned?
A Yeah, he lugged in.
Q And then what happened?
A Then I fell.
Q You slipped off the saddle?
A Yes, sir.
Q Did your foot slip out of the stirrup?
A Well, my whole self went down.
Q Did the horse do anythingwhat did the horse do after that?

*1010 A Took off running, he went at the barn.
Q He went back to the barn?
A Yeah.
Q And you fell on the ground?
A Yeah.
Q Did he shake his head and turn a lot or just a little bit?
A No, he was just playing with it a little bit, like this (motioning with head).
Q Was it like he was feeling good?
A Yeah, feeling good.
Q Had he ever done that before, shake his head like that?
A No, sir.
Q You had a bit on him, huh?
A Yeah.
Q Bridle?
A Yes, sir.
Q Did you ever have a horse to do that with you before?
A No, sir.
Q Shake his head like that?
A Well, that big filly did.
Q That big filly, is that the one we can't name?
A Yes.
Q She would do that often?
A Just that time when I went at the track with her.
Q The time she threw you?
A Yes, sir.
Q She did that too?
A Yes, sir.
Q Is it cause they wanted to run?
A Well, yeah, I guess so.
Q It is not anything unusual?
A No.
Q What?
A I guess it is because they wanted to run.
Q As you train them, the more we train them, the more they wanted to run?
A Yes, sir.
Q That was what would happen to all our horses that we were training, huh?
A Yes, sir.
Q As we would work them up, they would get more and more in the spirit of running?
A Yes, sir.
Q And did he want to run that day?
A Yes, sir.
Q And you were trying to keep him from running?
A Yes, sir.
Q You were trying to make him gallop and not run?
A Yes, sir.
Q And then he threw you?
A Yes.
 (Tr. pp. 33-36)
Q And you had ridden him a lot of times before that?
A Yes, sir.
Q Would you say it is anything that that horse did that was unusual that made you fall?
A Well, when he lugged in.
Q When he lugged in?
A Yes.
Q And this is not unusual, a lot of horses lug in?
A Yeah, a lot of horses lug in.
Q This is something that happens often?
A Yeah.
 (Tr. pp. 36-37)
Q Do you know of anything that I knew about this horse that you didn't know about him?
A No, sir.
Q Would it be fair to say that you probably knew this horse much better than me?
A I knew him better than you.
Q And probably better than Mr. Merton because you rode him, huh?
A Yeah.
Q Did I ever encourage you to believe that this horse wouldn't throw you?
A No, sir.
Q Did anybody ever tell you anything about this horse?
A No, sir.

*1011 Q Do you know if this horse had ever thrown anybody else before?
A No, sir.
Q Did anybody ever tell you that this horse was gentle?
A No, sir.
Q Did anybody ever tell you it was a wild horse?
A No, sir.
Q He wasn't a wild horse, was he?
A No, sir."
 (Tr. pp. 38-39)
It is apparent to this court that by Mitchell's own admission, the defendant never led him to believe that the horse was gentle. On the contrary, Mitchell and the defendant never even discussed the horse. This court is also convinced that there is no evidence that the horse had dangerous or vicious propensities. Mitchell's account of the accident supports the conclusion that the horse's behavior was not in any way unusual. Mitchell was being paid for a job that entailed certain natural and ordinary risks, such as being thrown from a horse. He knew that it took a good rider to handle the horses and considered himself such.
We conclude that there is no evidence that the horse Mitchell fell from had vicious or dangerous propensities which were concealed from him; that the harm suffered by Mitchell was encompassed by the natural and ordinary risks of his occupation; and that Mitchell assumed the risk of exactly what occurred when he accepted employment.
In the only section of the affidavit in opposition to the motion for summary judgment relevant to the issue of negligence, Clarence Fontenot, Mitchell's father, states, "That defendant did know that the horse which caused Mitchell Fontenot's injuries had vicious and uncontrollable propensities and the same was never revealed to Mitchell." This statement merely reiterates the allegation of the petition. In order to be sufficient to defeat the motion for summary judgment, it is incumbent upon the opponent to produce opposing affidavits or depositions indicating that there is a factual basis for dispute with the mover's showing. The opponent must set forth specific facts showing that there is a genuine issue for trial. Thomas v. Otwell, 234 So.2d 475 (La.App. 3rd Cir. 1970), writ refused; Dobbs House, Inc. v. Hastings, 265 So.2d 294 (La.App. 4th Cir. 1972). Since plaintiff has not complied with this requirement, his affidavit is not sufficient to defeat the motion for summary judgment.
Although this issue was not raised in the trial court or on appeal, we feel that plaintiff's remedy lies in workmen's compensation which is exclusive of all other rights and remedies. The record clearly establishes the employment relationship between Mitchell and the defendant, and, although farming operations are not hazardous per se, the evidence pertaining to Mitchell's connexity with the electric walking wheel is sufficient to warrant a finding of a hazardous occupation. Although we do not choose to rule on the issue, it would seem that, since Mitchell's accident apparently falls within the purview of the statute, his exclusive remedy is workmen's compensation.
For the above and foregoing reasons, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.