Deana R. HARDIN and Barry A. Hardin, Plaintiffs-Appellants,

v.

David K. CHRISTY, Individually, and David K. Christy, d/b/a Christy's Appaloosas, Defendants-Appellees.

No. 1–783A232.

Court of Appeals of Indiana,
First District.

April 25, 1984.

Rehearing Denied May 31, 1984.

Melvin R. Daniel, William C. Potter, II, Dann, Pecar, Newman, Talesnick & Kleiman, Indianapolis, for plaintiffs-appellants.

Donald L. Tunnell, John W. Hammel, Mark L. Dicken, Indianapolis, for defendants-appellees.

NEAL, Presiding Judge.

## STATEMENT OF THE CASE

Plaintiff-Appellants Deana and Barry Hardin appeal an adverse jury verdict rendered in their personal injury and loss of consortium action against David K. Christy. The action arose out of an incident in which Christy's Appaloosa stallion, Plaudit, attacked Deana.

We affirm.

## STATEMENT OF THE FACTS

Deana and Barry Hardin both have considerable experience in riding, training, showing, and handling horses. Deana in fact owned her first horse at age twelve. Barry and Deana married in 1972, and at the time of their marriage, they owned 13 horses. The Hardins subsequently commenced a part-time horse business in which they trained "outside horses": Deana handled approximately 70% of the training because Barry had a full-time job. Deana's task involved starting the colt off by teaching it the basic commands, walk, trot, cantor, and whoa. She then trained the colt to become accustomed to a saddle. Her husband took over the training at this point to work "the roughness out of the colt" and then finally Deana resumed training to finish the horse, "polish it for the show ring".

In 1978, the Hardins bought a farm in Coatesville, and they reconstructed the barn to suit the growing needs of the horse business, adding horse stalls, a tackroom, and an indoor area for training purposes.

Defendant-appellee David Christy worked with Barry for Ayr-Way and in January 1980, he asked Barry whether the Hardins would be willing to board his Appaloosa stallion,[1] Plaudit, while he was on vacation. Barry agreed, and the stallion was transported to the Hardins' farm.

On January 23rd, 1980, two weeks after the Hardins had commenced boarding Plaudit, the horse attacked Deana while she

---

1. A stallion's temperament fluctuates from the breeding season to the non-breeding season.

(Appellants' brief, pg. 7).

was exercising him. Until this date, Deana had cared for the stallion without incident. Just before the attack, Deana attached a lounge line to Plaudit's bridle and began working the stallion. After the exercise period had started, the horse suddenly stopped, "swung his hip around", and directly faced Deana. Sensing that something was wrong, Deana put down the lounge line, turned, and headed for the door. Plaudit followed her, knocked her to the ground, kneeled over her, and bit her on the head, neck, shoulders, back, and hands. In the process of the attack, Deana's right index finger was broken. Eventually Plaudit was distracted by the Hardins' dog and Deana managed to escape.

The Hardins learned shortly after the incident that Plaudit had in fact been involved in three prior incidents which resulted in personal injuries, the latest of which occurred in 1980. Christy did not mention the incidents when he asked Barry to board Plaudit; in fact, Christy stated that, in his opinion, the horse's behavior "is reasonable for a stallion".[2]

### ISSUES

The Hardins raise three issues on appeal:

I. The trial court erred in granting Christy's motion to strike Count II of the first amended complaint which dealt with misrepresentation.

II. The trial court erred in granting Christy's motion for judgment on the pleadings with respect to Hardins' strict liability count of the second amended complaint.

III. The verdict is not supported by the evidence.

### DISCUSSION AND DECISION

*Issue I: Motion to Strike*

The trial court granted Christy's motion to strike Count II of the Hardins' first amended complaint pursuant to Ind.Rules of Procedure, Trial Rule 12(F) as being

redundant to the allegations in Count I. Count I alleges that Deana's physical and mental injuries are a direct and proximate result of Christy's failure to warn the Hardins of the stallion's propensity to attack on occasion. Count II stated that the injuries are a result of Christy's misrepresentation and concealment of facts concerning Plaudit's propensities. Each count is made up of ten numerical paragraphs; Count II repeats paragraphs one through nine of Count I and then simply alleges a different legal theory in the tenth and conclusory paragraph.

■ A trial judge has a broad area of discretion in determining whether redundant material will be stricken. William Harvey, 1 *Indiana Practice*, Rule 12 at 610 (1969). *See Apple v. Apple*, (1973) 158 Ind.App. 7, 301 N.E.2d 534. His decision will not be reversed unless prejudicial error is clearly shown. *Smith v. Midwest Mutual Insurance Co.*, (1973) 154 Ind.App. 259, 289 N.E.2d 788.

■ In *Martz v. Stillwell*, (1968) 142 Ind. App. 572, 236 N.E.2d 185, the court cautioned that where "averments or matters in a pleading are in any way material" they should not be stricken out on motion under the auspices of T.R. 12(F). *Martz, supra*, at 573, 263 N.E.2d 185. A plea is material if it tends to constitute a cause of action or defense. *Id.* However, the *Martz* court diluted the liberality of the above pleading rule by adding:

"Although the sustaining of a motion to strike an averment from a pleading may be error it will be held harmless unless it prejudiced the party against whose pleading it is sustained. It is also harmless error if the same evidence is admissible under another allegation in the pleading."

*Id.* at 574, 263 N.E.2d 185.

In their brief, Hardins outline the elements of the theories of negligent failure to warn and misrepresentation in order to

**2.** Barry, on the other hand, recalled in his testimony that Christy represented Plaudit to be as "gentle as a lamb".

illustrate the distinction between the two causes of action. They readily admit that the two counts of the complaint have the same factual basis but contend that they were prejudiced by the striking of the misrepresentation count. They do not, however, substantiate the allegation of prejudice.

■ We agree with Hardins that misrepresentation in and of itself constitutes a separate cause of action; however, we believe that the striking of the misrepresentation count is harmless error as the evidence admissible under Count II is the same as the evidence admissible under Count I, negligent failure to warn. *See Martz, supra.*

We find only harmless error here.

*Issue II: Strict Liability*

■ Hardins assert that the trial judge erred in granting a motion for judgment on the evidence with regard to the strict liability count of their complaint. In granting Christy's motion, the trial court consequently refused to read Hardins' jury instruction on the subject, which stated:

"Horses are not naturally ferocious or dangerous animals and an owner of a horse is not strictly liable for injuries caused by the horse unless the owner had knowledge of a vicious propensity of a particular animal."

Hardins cite *Thompson v. Lee*, (1980) Ind. App., 402 N.E.2d 1309 as authority for the above proposition of law; indeed, the instruction is virtually a verbatim statement from the *Thompson* case.

*Thompson* involved a motorcyclist's claim against the owner of a Black Angus cow which had escaped from a fenced field and wandered onto a county road. The motorcyclist struck the cow and sustained severe injury as well as property damage.

Initially, Thompson brought his claim under a strict liability theory; this complaint was dismissed by the trial court, and the plaintiff ultimately proceeded under a negligence claim. One of the issues, then, before the First District was whether a strict liability theory could have been asserted under the above set of facts. Judge Robertson, writing for the court, explained that there are only two circumstances in which strict liability is imposed on the owners of animals which have caused injury. The first situation occurs when the injury is the result of an attack by a naturally ferocious or dangerous animal, *animal ferae naturae*. *Bostock-Ferari Amusement Co. v. Brocksmith*, (1904) 34 Ind.App. 566, 73 N.E. 281.

"[The] second circumstance arises out of technical pleading of a common law history. If cattle, for instance, broke into another's fenced field, the injured party could sue under trespass—specifically trespass quare clausum fregit—the breaking of the close. Principles of negligence were not involved in this action."

*Thompson, supra,* at 1311 (Citations omitted).

Ultimately, the court determined that neither situation was applicable to the *Thompson* case since first, the Angus cow is not a "naturally ferocious animal"; and second, the facts did not involve a trespassing cow but rather an escaping one. *Id.* at 1312.

Hardins argue, in spite of the clear limitations set out in the above discussion, that the language from *Thompson* included in their instruction constitutes yet a third circumstance under which strict liability is imposed: an owner is strictly liable for injuries caused by his domestic animal if he has knowledge of a vicious propensity of that animal. This proposition is evidently a watered-down derivative of the *animal ferae naturae* situation to which strict liability precepts apply.

While there appears to be little doubt that a domestic animal owner may be liable for resultant injuries, the question remains as to what *type* of liability attaches. "In some jurisdictions, the owner may be held absolutely or strictly liable if the injured party was not himself at fault, and in others, he is at least prima facie negligent." 4 Am.Jur.2d Animals Sec. 85 (1962). Indiana's position on this question of law is somewhat difficult to ascertain.

In *Klenberg v. Russell,* (1890) 125 Ind. 531, 25 N.E. 596, a seminal case in this area, the so-called "vicious propensity" language first arose in the context of a cow which, permitted to run at large, attacked and injured a woman. Determining that the trial court erred in overruling the owner's demurrer to the plaintiff's charge of negligence, the court stated:

> "And all of the authorities seem to agree that the owner of a domestic animal·is not liable because of a negligent failure to keep it confined on his own premises, except for the consequences which may be anticipated because of its well-known disposition and habits, unless it is possessed of a vicious disposition of which he had notice."

*Klenberg, supra,* at 534, 25 N.E. 596.

The above statement of law was further refined in *Gordon v. Kaufman,* (1909) 44 Ind.App. 603, 89 N.E. 898, in which the defendant allowed his vicious dog to run loose and the dog attacked the plaintiff. The court upheld the judgment for Kaufman, explicitly setting forth the legal theory under which a plaintiff pursues his cause of action under these factual circumstances: "the failure to secure the animal known to be dangerous renders the keeper liable for injury caused by the animal to one not at fault, the cause being treated as an action for negligence." *Gordon, supra,* at 607, 89 N.E. 898, citing *Graham v. Payne,* (1890) 122 Ind. 403, 24 N.E. 216; *Clanin v. Fagan,* (1890) 124 Ind. 304, 24 N.E. 1044; *Klenberg, supra.* See *Indianapolis Abattoir Company v. Bailey,* (1913) 54 Ind.App. 370, 102 N.E. 970.

It should be noted that both *Klenberg* and *Gordon* deal with the escape of the vicious domestic animal—the animal is roaming free, out of the control of the owner. *Thompson,* as a matter of fact, concerned the escape of the cow: viciousness was never an issue, and as such *Thompson* is easily distinguishable from the instant case.

*Doe v. Barnett,* (1969) 145 Ind.App. 542, 251 N.E.2d 688, however, is not only a more recent discussion of the "vicious pro-pensity" doctrine but is more factually akin to the present cause of action.

In *Doe,* the plaintiff and his minor son were visiting the premises of a corral owned by the defendants. Shortly after their arrival, one of the defendant's horses bit the boy on the left side of his face. The trial court granted the owners' motion for summary judgment and the Court of Appeals considered the propriety of such action.

After engaging in a lengthy review of earlier Indiana decisions involving the "vicious propensity" principle which included some of the same sources we have discussed herein, the *Doe* court actually defined vicious propensity, stating it is "a propensity or tendency of an animal to do any act which might endanger the safety of person or property in a given situation." *Doe, supra,* at 552, 251 N.E.2d 688. The court went on to add:

> "We would emphasize that we are not here attempting to expand the settled rules of liability announced in the Indiana cases and the other authorities cited in this opinion. We would further emphasize that these rules of liability are based upon negligence and not strict liability."

*Id.* at 551–52, 251 N.E.2d 688.

The Court of Appeals then decided that the record failed to disclose that the owners were entitled to judgment as a matter of law and remanded the case for determination as to whether the appellees had knowledge of the horse's alleged vicious propensities and as to whether they exercised reasonable care with respect to the child. *Id.* at 554, 251 N.E.2d 688.

As we understand their argument, Hardins' attempt to disengage the instant case from the applicability of the above definitive statement is premised first, on the fact that *Doe* dealt with the attack of a gelding, not a stallion; and second, on the fact that the *Doe* plaintiffs chose to proceed only on a negligence theory, not strict liability. We will discuss the first distinction.

Hardins correctly assert that the negligence standard set out in *Doe* is rephrased in Sec. 518 of the Restatement (Second) of Torts, which states:

"Liability for Harm Done by Domestic Animals That Are Not Abnormally Dangerous

Except for animal trespass, one who possesses or harbors a domestic animal *that he does not know or have reason to know to be abnormally dangerous*, is subject to liability for harm done by the animal if, but only if,

(a) he intentionally causes the animal to do the harm, or

(b) he is negligent in failing to prevent the harm."

(Our emphasis).

They then argue that neither the *Doe* standard nor Sec. 518 apply to this action because Plaudit, a stallion, is a domestic animal that is abnormally dangerous; further, Sec. 518 is inapplicable because Christy had knowledge of Plaudit's "dangerous" qualities due to the three previous incidents. Instead, Hardins urge us to adopt Sec. 509 of the Restatement (Second) of Torts, a standard which goes beyond the aforementioned Indiana case law:

"Harm Done by Abnormally Dangerous Domestic Animals

(1) A possessor of a domestic animal that *he knows or has reason to know has dangerous propensities abnormal to its class*, is subject to liability for harm done by the animal to another, although he has exercised the utmost care to prevent it from doing the harm.

(2) This liability is limited to harm that results from the abnormally dangerous propensity of which the possessor knows or has reason to know."

(Our emphasis).

Sec. 509 is subject to many qualifications, including the one in Comment (e) which follows the above rule:

"*Animals in which dangerous propensities are normal.* There are certain classes of domestic animals in which dangerous propensities are normal although abnormal in other classes of their species. Bulls are more dangerous than cows and steers; stallions are more dangerous than mares and geldings; rams are more dangerous than ewes and lambs. However, these animals have been kept for stud purposes from time immemorial so that the particular danger involved in their dangerous tendencies has become a normal incident of civilized life. This, together with the fact that the virility which makes them dangerous is necessary for their usefulness in performing their function in the socially essential breeding of livestock, justifies the risk involved in their keeping. Therefore, the law has not regarded bulls, stallions and rams as being abnormally dangerous animals to be kept under the strict liability stated in this section.... Although one who keeps these animals is not subject to the strict liability stated in this section, he is liable unless he exercises in their custody care commensurate with their normal dangerous characteristics. On the other hand, although a certain amount of danger is inseparable from the keeping of these socially essential or useful animals, there is no social value in keeping animals that are vicious or have other dangerous propensities that are in excess of those necessary for their utility and are abnormal to their class."

Hardins valiantly try to escape the conclusion required by the above language by stating that Christy's alleged misrepresentation concerning Plaudit's behavior, i.e. that the stallion was as "gentle as a lamb", removed Plaudit from his status as an exception to the rule of Sec. 509.

The evidence of the three prior instances of alleged viciousness is as follows: in 1976, while Plaudit was held by Mrs. Christy and washed by Christy's brother in preparation for a horse show, the brother squirted Plaudit in the tail area with a hose. Plaudit reacted by biting and kicking Mrs. Christy, thereby injuring her. Somewhat near the same time, Plaudit chased the same brother out of a pasture. The last incident occurred in January 1980,

during a riding outing when Christy was mounted upon Plaudit and his nine-year old son was riding a gelding. As the son rode up behind Plaudit, Plaudit kicked the gelding, causing it to bolt. The son fell off the horse and broke his wrist.

Dr. Fred Benker, a veterinarian, testified Plaudit's conduct in these instances is not abnormal to his class as within the context of the latter part of Comment (e) of Sec. 509. We agree.

Although not necessary to the decision, we are constrained to observe the following. The rationale for the imposition of strict liability against owners for injuries caused by dangerous animals is discussed in W. Prosser, *Law of Torts* 499 (4th Ed. 1971). Professor Prosser explains that the rule is simply based on the concept that responsibility is placed on those who, even with proper care, expose the community to the risk of a very dangerous entity. The law recognizes that safety lies only in keeping the animal secure. *Bostock-Ferari, supra,* 34 Ind.App. at 568, 73 N.E. 281. The typical situation in which some courts have been willing to consider the application of strict liability precepts involves the escape of an animal with known dangerous or vicious propensities that bites, gores, or kicks innocent bystanders or social guests. The basis of liability is failure to control or confine the animal. We have great difficulty, though, in applying the strict liability concepts and rationale under any circumstances when injury is suffered by a professional keeper, trainer, or handler while engaged in his profession. We accept the concept of potential liability under a negligence theory when an owner delivers a dangerous animal to a plaintiff, even a professional, as here, without disclosing facts known to him of the abnormal vicious propensities of the animal which the bailee may not be expected to know. *See Doe, supra,* and other cases discussed herein. We note, however, that some courts have dealt with this problem by application of the doctrine of assumption of the risk, discussed *infra.*

We find no error.

*Issue III: Sufficient Evidence*

Hardins restate this issue differently. They argue that since the evidence is undisputed that Christy was negligent, the jury's determination must have been based on one of Christy's two affirmative defenses, namely, contributory negligence or incurred risk. They then assert that the elements of these affirmative defenses were not sufficiently supported by the evidence.

This court may not respond to thinly—obfuscated entreaties to reweigh the evidence. The Hardins are appealing from a negative judgment: we neither reweigh the evidence nor assess the witnesses' credibility. *Bohnke v. Estate of Bohnke,* (1983) Ind.App., 454 N.E.2d 446. The inquiry on appeal is limited to whether the verdict is sustained by substantial evidence of probative value. *Fleetwood Corporation v. Mirich,* (1980) Ind.App. 404 N.E.2d 38.

The requisite elements for an action in negligence are duty, breach of that duty, and resultant injury. *Taylor v. Indiana Bell Telephone Co.,* (1970) 147 Ind.App. 507, 262 N.E.2d 399. Hardins argue that Christy had a duty to warn them of the three prior incidents: had he done so, they would not have boarded Plaudit and Deana would not have been injured.

Initially, it is not at all certain that Christy's negligence is a given. There was evidence introduced at trial from which the jury could have inferred that Christy was under no duty to inform Hardins of the prior incidents. Dr. Benker, the veterinarian, testified that when a stallion is near another stallion or a gelding, it becomes "very, very aggressive and hard to handle". The doctor stated that generally, stallions are difficult to be around. After hearing a description of the three prior events involving Plaudit, Dr. Benker opined that such behavior did not make the horse unusual.

Even assuming for the sake of argument that the jury did find Christy negligent in not informing Hardins of the past incidents, the evidence is sufficient for the jurors to find that Deana had either in-

curred the risk or was contributorily negligent. "Incurred risk and contributory negligence are generally questions of fact for the jury, and the verdict should not be disturbed if evidence is conflicting or if reasonable minds could draw different inferences from the evidence." *The Kroger Co. v. Haun,* (1978) 177 Ind.App. 403, 379 N.E.2d 1004.

 Contributory negligence is the failure of a person to exercise for his own safety that degree of care and caution which a reasonable and prudent person in a similar situation would exercise. *Kroger, supra,* at 408, 379 N.E.2d 1004. The rules which determine the contributory negligence of a plaintiff are the same as those which determine the negligence of the defendant. Sec. 289, Comment (a) Restatement (Second) of Torts. *See Layman v. Hall Omar Baking Co.,* (1966) 138 Ind. App. 673, 215 N.E.2d 692.

> "The standard of the reasonable man requires only a minimum of attention, perception, memory, knowledge, intelligence, and judgment in order to recognize the existence of the risk. If the actor has in fact more than the minimum of these qualities, he is required to exercise the superior qualities that he has in a manner reasonable under the circumstances."

Comment (m), Sec. 289, Restatement (Second) of Torts.

In explaining the doctrine of incurred risk,[3] *Colaw v. Nicholson,* (1983) Ind.App., 450 N.E.2d 1023, citing *Kroger,* stated:

> "... Incurred risk demands a subjective analysis into the particulars of an actor's knowledge. Incurred risk involves a voluntary acceptance of the risk; a mental state of venturousness.... Incurred risk contemplates acceptance of a specific risk of which the plaintiff has actual knowledge."

*Colaw, supra,* at 1029 (Citations omitted).

 Deana has been riding horses since the third grade, and she trained her first

horse, a two-year old quarter horse stallion, at age 16. Deana and her husband are in the business of training and boarding horses. Deana was, in essence, a "consenting victim" instead of an "innocent bystander"; Plaudit was under her care, custody, and control. *Fontenot v. Soileau,* (1976) La. App., 336 So.2d 1006. The veterinarian, Dr. Benker, definitely stated that a horse handler should know never to turn his back on a stallion. Such an action indicates fear to a stallion and he is likely to become even more aggressive.

We find no error here.

For the above reasons, this cause is affirmed.

Judgment affirmed.

ROBERTSON and RATLIFF, JJ., concur.

---

**3.** While some courts have limited the term "assumption of the risk" to cases in which the parties stand in some sort of contractual relation, and have created other terms, such as "incurred risk" for other cases, this is generally considered a distinction without a difference. Hence the terms are essentially interchangeable. W. Prosser, *Law of Torts* 440 (4th Ed.1971).