**Scott IRVINE, Appellant–Plaintiff,**

v.

**RARE FELINE BREEDING CENTER, INC., and Mosella Schaffer, Appellees–Defendants.**

**No. 29A04–9703–CV–120.**

Court of Appeals of Indiana.

Sept. 10, 1997.

John J. Sullivan, Indianapolis, for Appellant–Plaintiff.

Edward F. Harney, Jr., Hume Smith Geddes Green & Simmons, Indianapolis, for Appellees–Defendants.

## OPINION

CHEZEM, Judge.

### Case Summary

Appellant–Plaintiff, Scott Irvine ("Irvine"), appeals an order denying his motion for partial summary judgment. We affirm.

### Issues

The parties raise various issues which we restate as:

I. Whether strict liability is the law in Indiana wild animal cases;

II. Whether any exceptions or defenses to strict liability should be recognized; and,

III. Whether a genuine issue of material fact exists regarding either Irvine's status or any available defenses.

### Facts and Procedural History

For the past thirty years, Mosella Schaffer ("Schaffer") [1] has lived on a fifty acre farm in Hamilton County, Indiana where she has raised and maintained exotic animals. These animals have included zebras, llamas, camels, kangaroos, and, beginning in 1970, Siberian tigers. Although her original intent was to breed and sell the animals, she soon found it difficult to part with many of them.

In 1993, Scott Bullington ("Bullington") was renting a room in the garage area of Schaffer's house. Aware of his friend Irvine's interest in wild animals, Bullington informed Irvine of Schaffer's farm and the animals she kept there. Irvine, then in his late twenties, began to stop by and see the animals as per Schaffer's open invitation. Over the next two years, Irvine visited Schaffer's farm several dozen times. During these visits, people would occasionally pet the tigers through a fence.

On the afternoon of December 2, 1995, Irvine arrived at Schaffer's home to see Bullington. The two men drank alcohol and watched television until early evening when Bullington announced that he had to leave to attend his employer's Christmas party. Because Irvine had consumed a substantial amount of alcohol, Bullington told Irvine he could stay over night on the couch. Some time after Bullington had left, Irvine exited Bullington's apartment, walked to the front of Schaffer's property and visited with the llamas and zebras. As he was doing so, Schaffer drove up, stopped her car, had a brief, friendly conversation with Irvine, and went into her house.

Around 8:00 p.m., Irvine decided to visit the tigers before going to sleep. Thus, he went through Schaffer's garage, proceeded through the utility room, continued through the sun room, and ended up in the back yard. Irvine then approached the wire caging, as he and others had done in the past, placed a couple fingers inside the enclosure, and attempted to pet a male tiger. As he was scratching the male tiger, a female tiger made some commotion, which caused Irvine to look away from the male tiger. At that moment, the male tiger pulled Irvine's arm through the two inch by six inch opening of the wire fence.

Upon hearing Irvine's shouts, Schaffer came out of her house, banged an object against the fence, and freed Irvine. Schaffer immediately drove Irvine to the hospital. Irvine was treated and admitted to the hospital. Later, he was transferred to another hospital, and underwent six surgeries during a thirteen day hospital stay. Further surgeries are indicated though Irvine is uninsured.

On May 30, 1996, Irvine filed a complaint against Schaffer containing four counts: negligence, strict liability, nuisance, and punitives. On September 6, 1996, Irvine filed his motion for partial summary judgment on the basis that incurred risk and assumption of risk are not valid defenses to a strict liability wild animal claim, on the basis that assumption of risk is not available in a non-contract case, and on the basis that the defense of open and obvious is not available in an animal

---

1. Various spellings for Schaffer's first name appear throughout the record. We use "Mosella" because it appears on the record of proceedings and in the appellate briefs.

liability case. Schaffer filed a response on January 14, 1997. Irvine filed a reply on January 21, 1997. The trial court denied Irvine's motion for summary judgment on the strict liability count, denied summary judgment on the issue of assumption of risk, and granted summary judgment on the issue of open and obvious. The trial court granted Irvine's petition to certify three issues for interlocutory appeal: 1) whether incurred risk or other defenses are available in a strict liability animal case; 2) whether Irvine was an invitee as a matter of law; and 3) whether the defense of assumption of risk is available in a noncontractual case. We accepted jurisdiction of the interlocutory appeal.

### Discussion and Decision

Irvine first argues that Indiana has historically adhered to strict tort liability in wild animal cases. He further argues that when the Indiana Comparative Fault Act (Ind. Code § 34–4–33–1 et seq., the "Act") was adopted, it did not change the law in wild animal cases. Moreover, he claims that no exceptions to strict liability in wild animal cases have ever been applied in Indiana. He also argues that even if his status is somehow relevant, he was clearly an invitee. Thus, he asserts that the trial court should not have denied his summary judgment on the strict liability issue. In contrast, Schaffer argues that Indiana has not adopted, and should not adopt, strict liability in wild animal cases. In the alternative, Schaffer asserts that if strict liability is the general rule, an exception should apply here.

 Upon review of the grant or denial of a summary judgment motion, we apply the same legal standard as the trial court: summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C); *North Snow Bay, Inc. v. Hamilton*, 657 N.E.2d 420, 422 (Ind.Ct.App.1995). On review, we may not search the entire record to support the judgment, but may only consider that evidence which had been specifically designated to the trial court. *Id.* The party appealing the trial court's grant or denial of summary judgment has the burden of per-

suading this court that the trial court's decision was erroneous. *Id.*

### I. Liability in a Wild Animal Case

We first address whether strict liability is the common law rule for wild animal cases in Indiana. The parties have not cited and we have not found a case specifically applying strict liability to a true wild animal case in Indiana. However, the basic rule has been frequently stated in various contexts. *Holt v. Myers*, 47 Ind.App. 118, 93 N.E. 31 (1910) (mentioning wild animal strict liability rule although case dealt with vicious dog); *Gordan v. Kaufman*, 44 Ind.App. 603, 89 N.E. 898 (1909); *Bostock–Ferari Amusement Co. v. Brocksmith*, 34 Ind.App. 566, 73 N.E. 281 (1904) (setting out wild animal rule and its rationale, but not applying it because bear's inherent dangerousness was not cause of harm); *Partlow v. Haggarty*, 35 Ind. 178 (1871); *see also Hill v. Rieth–Riley Constr. Co.*, 670 N.E.2d 940, 945 (Ind.Ct.App.1996) ("The term 'inherently dangerous' is more properly applied to activities or instrumentalities which are, by their nature, always dangerous, i.e. blasting or wild animals.") Accordingly, we have little difficulty concluding that Indiana's common law recognized the strict liability rule for wild animal cases— despite the fact that previously, Indiana courts have not had the opportunity to apply the rule.

 We next address the issue of whether the adoption of the Act changed the common law rule of strict liability in wild animal cases. "We presume the legislature does not intend by the enactment of a statute to make any change in the common law beyond what it declares, either in express terms or by unmistakable implication." *Rocca v. Southern Hills Counseling Center, Inc.*, 671 N.E.2d 913, 920 (Ind.Ct.App.1996). An abrogation of the common law will be implied (1) where a statute is enacted which undertakes to cover the entire subject treated and was clearly designed as a substitute for the common law; or, (2) where the two laws are so repugnant that both in reason may not stand. *Id.* "As a statute in derogation of the existing common law, the Act must be strictly construed." *Indianapolis Power &*

*Light Co. v. Brad Snodgrass, Inc.,* 578 N.E.2d 669, 673 (Ind.1991).

The Act, enacted in 1983 and effective in 1985, "governs any action based on fault[.]" Ind.Code § 34–4–33–1. Strict liability, by definition, is liability without fault. *Black's Law Dictionary* 991 (abridged 6th ed.1991). Thus, the Act would seem to be inapplicable to a strict liability action. The legislative history lends further support for this conclusion. The original version of Ind.Code § 34–4–33–2 provided that "Fault," for purposes of the Act, "include[d] any act or omission that [was] negligent, willful, wanton, reckless, or intentional toward the person or property of others, *or that subject[ed] a person to strict tort liability,* but [did] not include an intentional act. The term also include[d] breach of warranty, unreasonable assumption of risk not constituting an enforceable express consent, incurred risk, misuse of a product for which the defendant otherwise would be liable, and unreasonable failure to avoid injury or to mitigate damages." (Emphasis added).

By the time of its effective date, that same section had been changed to its current form: " '[f]ault' includes any act or omission that is negligent, willful, wanton, reckless, or intentional toward the person or property of others. The term also includes unreasonable assumption of risk not constituting an enforceable express consent, incurred risk, and unreasonable failure to avoid injury or to mitigate damages." Ind.Code § 34–4–33–2. The current form includes no reference to strict liability. Narrowly construing the Act, we conclude that it does not explicitly apply to a strict liability claim. *See Templin v. Fobes,* 617 N.E.2d 541, 544 n. 1 (Ind.1993) (products liability case in which our supreme court noted, "practical problems arise, at least in part, because of the operation of Indiana's Comparative Fault Act, which would apply in Templins' negligence claims against Fobes but not in the Templins' strict liability claim against Rockwood.").

## II. Exceptions or Defenses

Having concluded that the Act has not changed common law strict liability in wild animal cases, we next address Irvine's contention that no exceptions to strict liabili-ty in wild animal cases have ever been applied in this state. While we agree with Irvine's contention, this fact is of no surprise in view of the lack of any true wild animal cases in Indiana. As this is an issue of first impression, we look to the reason behind the strict liability wild animal rule and consult other sources as necessary.

We have previously set out the rationale for imposing strict liability against owners for injuries caused by an attack by a naturally ferocious or dangerous animal. *See Hardin v. Christy,* 462 N.E.2d 256, 259, 262 (Ind.Ct.App.1984) (citing *W. Prosser, Law of Torts* (4th ed.1971)). Strict liability is appropriately placed:

> upon those who, even with proper care, expose the community to the risk of a very dangerous thing. . . . The kind of "dangerous animal" that will subject the keeper to strict liability . . . must pose some kind of an abnormal risk to the particular community where the animal is kept; hence, the keeper is engaged in an activity that subjects those in the vicinity, including those who come onto his property, to an abnormal risk . . . The possessor of a wild animal is strictly liable for physical harm done to the person of another . . . if that harm results from a dangerous propensity that is characteristic of wild animals of that class. Thus, strict liability has been imposed on keepers of lions and tigers, bears, elephants, wolves, monkeys, and other similar animals. No member of such a species, however domesticated, can ever be regarded as safe, and liability does not rest upon any experience with the particular animal.

*W. Page Keeton et al., Prosser and Keeton on the Law of Torts* § 76, at 541–42 (5th ed. 1984). Although having done so in an asbestos case and using slightly different terms, Judge Posner concisely set out the rationale for the wild animal strict liability rule using the following hypothetical:

> [k]eeping a tiger in one's backyard would be an example of an abnormally hazardous activity. The hazard is such, relative to the value of the activity, that we desire not just that the owner take all due care that the tiger not escape, but that he consider

seriously the possibility of getting rid of the tiger altogether; and we give him an incentive to consider this course of action by declining to make the exercise of due care a defense to a suit based on an injury caused by the tiger—in other words, by making him strictly liable for any such injury.

*G.J. Leasing Co. v. Union Electric Co.,* 54 F.3d 379, 386 (7th Cir.1995).

With the rationale for the rule in mind, we analyze whether any exceptions or defenses to the strict liability wild animal rule are appropriate. Like the sources previously cited, the *Restatement* provides:

(1) A possessor of a wild animal is subject to liability to another for harm done by the animal to the other, his person, land or chattels, although the possessor has exercised the utmost care to confine the animal, or otherwise prevent it from doing harm.

(2) This liability is limited to harm that results from a dangerous propensity that is characteristic of wild animals of the particular class, or of which the possessor knows or has reason to know.

*Restatement (Second) of Torts* § 507 (1977). However, because the general rule in § 507 is "subject to a number of exceptions and qualifications, which are too numerous to state in a single Section," § 507 should be read together with § 508, § 510, § 511, § 512, § 515, and § 517. *Restatement, supra* cmt. a, § 507. Thus, we look to those other sections to help flesh out the *Restatement*'s rule.

Section 510(a) provides: "The possessor of a wild animal ... is subject to strict liability for the resulting harm, although it would not have occurred but for the unexpectable ... innocent, negligent or reckless conduct of a third person." However, "[a] possessor of land is not subject to strict liability to one who intentionally or negligently trespasses upon the land, for harm done to him by a wild animal ... that the possessor keeps on the land, even though the trespasser has no reason to know that the animal is kept there." *Restatement, supra* § 511. Invitees

and licensees are dealt with in § 513, which states: "The possessor of a wild animal ... who keeps it upon land in his possession, is subject to strict liability to persons coming upon the land in the exercise of a privilege whether derived from his consent to their entry or otherwise." Yet, if the invitee or licensee "knows that the dangerous animal is permitted to run at large or has escaped from control they may be barred from recovery if they choose to act upon the possessor's consent or to exercise any other privilege and thus expose themselves to the risk of being harmed by the animal. (See § 515)." *Restatement, supra* cmt. a, § 513.[2]

Section 515(2), in turn, provides: "The plaintiff's contributory negligence in knowingly and unreasonably subjecting himself to the risk that a wild animal ... will do harm to his person ... is a defense to the strict liability." Comment c. to § 515(2) explains:

Although one harmed by a wild ... animal that has escaped from control of its possessor or harborer is not barred from recovery because he has not exercised ordinary care to observe the presence of the animal or to escape from its attack, he is barred if he intentionally and unreasonably subjects himself to the risk of harm by the animal. Thus *one who without any necessity for so doing that is commensurate with the risk involved knowingly puts himself in reach of an animal that is effectively chained or otherwise confined cannot recover against the possessor or harborer of the animal.* So, too, although a licensee or an invitee upon land of another upon which he knows that wild ... animals are kept under the possessor's control does not take the risk that they will escape and harm him, he does nonetheless take the risk of harm by the animals that he knows are roaming at large, so that he will to a reasonable certainty encounter them if he avails himself of the invitation or permission held out to him by the possessor of the land. (Emphasis added).

Comment d. to § 515(2) states: "This kind of contributory negligence, which consists of

**2.** In view of the specific citation to § 515 contained with § 513, comment a, we disagree with Irvine's contention that § 515 only applies to trespassers.

voluntarily and unreasonably encountering a known danger, is frequently called either contributory negligence or assumption of risk, or both."

Section 515(3) provides: "The plaintiff's assumption of the risk of harm from the animal is a defense to the strict liability." The comment to § 515(3) states that "one employed as a lion tamer in a circus may be barred from recovery by his assumption of the risk when he is clawed by a lion. In the same manner, *one who* voluntarily teases and provokes a chained bear, or *goes within reach of a vicious dog*, is barred from recovery if he does so with knowledge of the danger." (Emphases added).

As indicated by the extensive quotations above, the *Restatement* clearly recognizes exceptions or defenses[3] to wild animal strict liability. Prosser and Keeton also agree that defenses are available to a strict liability wild animal claim. "[C]ontributory negligence by way of knowingly and unreasonably subjecting oneself to a risk of harm from an abnormally dangerous animal will constitute a defense" to a strict liability claim. *Prosser and Keeton,* supra § 79, at 565. "Thus, a plaintiff who voluntarily and unreasonably comes within reach of an animal which he knows to be dangerous, ... has no cause of action when it attacks him." *Id.* at 566; *see also Opelt v. Al. G. Barnes Co.,* (1918), 41 Cal. App. 776, 183 P. 241 (crawling under rope near leopard's cage); *Heidemann v. Wheaton,* (1948), 72 S.D. 375, 34 N.W.2d 492 (going within reach of bear).

Because we agree with the rationale of the exceptions and/or defenses set out in the *Restatement,* and because we find it to be in keeping with Indiana's recent policy regarding allocation of fault, we adopt the *Restatement*'s approach in wild animal cases.

### III. Genuine Issues of Material Fact

Finally, we address whether any genuine issues of material fact exist which would support the trial court's partial denial of summary judgment.

### A. Irvine's Status

In view of our adoption of the *Restatement*'s strict liability wild animal rule along with its exceptions and defenses, Irvine's status becomes important. In some circumstances, a party's status (as either an invitee, licensee, or trespasser) is a question of fact not determinable at the summary judgment level. *See Duffy v. Ben Dee, Inc.,* 651 N.E.2d 320, 322 (Ind.Ct.App.1995), *trans. denied.* However, where the operative facts are not in dispute, a party's status may be determined as a matter of law by the trial court. *See Dunifon v. Iovino,* 665 N.E.2d 51, 55 (Ind.Ct.App.1996), *trans. denied.*

In arguing that he was an invitee as a matter of law, Irvine relies upon the following evidence:

a) Irvine was invited by Schaffer to come any time (R. 153).

b) Schaffer's affidavit does not deny the above testimony; rather, she claimed that Irvine was specifically not invited by her on the day of the accident (R. 69).

c) Irvine was on the premises 80–100 times (R. 149–50).

d) Bullington testified that Irvine had specifically visited him at least 30 times (R. 218).

e) On several occasions, Irvine had gone through the passageway or breezeway between Schaffer's house and garage and Schaffer voiced no objection (R. 152).

f) On the day of the accident, Bullington had invited Irvine to stay (R. 227).

g) On December 2, 1995, and before the accident, Schaffer saw Irvine on her premises, chatted with him, and did not ask him to leave (R. 165).

In contrast, Schaffer has introduced her own affidavit which states that Irvine did not have permission to enter her house or the backyard containing the tiger enclosure. (R. 72).

---

**3.** Although some courts attempt to make distinctions, often times the various defenses are used interchangeably to describe virtually identical conduct. Thus, what one judge or commentator might call incurred risk, another might call assumed risk, or more generally, contributory negligence. To the extent that they recognize similar conduct, we too use the defenses interchangeably in this context.

Her affidavit also states that Bullington did not have authority to give Irvine permission to enter her home or the backyard containing the tiger enclosure. *Id.* Accordingly, there is some conflicting evidence regarding Irvine's status, thus precluding summary judgment on this issue.

### B. Defenses

 In adopting the Restatement's view that incurred risk/assumed risk may be a defense to a strict liability wild animal claim,[4] we must next examine whether genuine issues of material fact exist regarding a defense in Irvine's case. Incurred risk requires a mental state of venturousness and a conscious, deliberate and intentional embarkation upon the course of conduct with knowledge of the circumstances. *Perdue Farms, Inc. v. Pryor,* 683 N.E.2d 239, 242 (Ind. 1997). In other contexts, we have stated that the defense of incurred risk is generally a question of fact, and the party asserting it bears the burden of proving it by a preponderance of evidence. *Schooley v. Ingersoll Rand, Inc.,* 631 N.E.2d 932, 939 (Ind. Ct.App.1994).

Here, the parties designated conflicting evidence regarding whether Irvine knowingly and unreasonably put himself within reach of a wild animal that was effectively chained or otherwise confined. There was evidence that around the time of the accident, Irvine had been volunteering at the Indianapolis Zoo and had been told not to have contact with tigers. Moreover, there was evidence that Irvine was aware of a prior incident wherein the tiger which injured him grabbed another man's thumb. However, there was other evidence tending to indicate that Schaffer and others had petted the tiger safely in the past. Also, there was evidence that Irvine may have been rather intoxicated on the night in question. In view of the conflicting evidence and inferences, summary judgment

was properly denied on the issue of whether a defense was appropriate in this case.

Affirmed.

DARDEN and BARTEAU, JJ., concur.

**4.** In recognizing incurred risk as a potential defense to strict liability wild animal cases, we are unpersuaded by Irvine's citation to *Petroski v. Northern Indiana Public Service Co.,* 171 Ind. App. 14, 354 N.E.2d 736, 745 n. 9 (1976). Rather than deciding the issue presented today, footnote nine merely stated, "The broad incurred risk defense enunciated in Indiana negligence cases, which rests in part on an objective reasonable man standard, *may* be inapplicable to Indiana strict liability cases." (Emphasis added).