# ANTHONY VENDRELLA ET AL. *v.* ASTRIAB FAMILY LIMITED PARTNERSHIP ET AL.
## (AC 32735)

DiPentima, C. J., and Gruendel and Bishop, Js.

Argued December 5, 2011—officially released February 21, 2012

*William F. Gallagher,* with whom, on the brief, were *Hugh D. Hughes, Joseph D. Foti, Jr.,* and *Garrett Moore,* for the appellants (plaintiffs).

*Steven L. Seligman,* with whom, on the brief, was *Lester Katz,* for the appellees (defendants).

*Opinion*

GRUENDEL, J. This case concerns natural propensities of a class of domestic animal. The plaintiffs, Anthony Vendrella and his son, Anthony John Vendrella,[1] appeal from the summary judgment rendered in favor of the defendants, the Astriab Family Limited Partnership and Timothy D. Astriab.[2] They claim that the court improperly concluded that no genuine issue of material fact

[1] The plaintiff Anthony John Vendrella, a minor, brought this action by and through his mother, Marylou Vendrella. Because they share the same name, we refer to the plaintiffs individually as "the plaintiff father" and "the plaintiff son" in this opinion.

[2] The complaint also named "Timothy D. Astriab d/b/a Glendale Farms" as a defendant. As our Supreme Court has explained, "the use of a fictitious or assumed business name does not create a separate legal entity . . . [and] [t]he designation [doing business as] . . . is merely descriptive of the person or corporation who does business under some other name . . . . [I]t signifies that the individual is the owner and operator of the business whose trade name follows his, and makes him personally liable for the torts and contracts of the business . . . ." (Internal quotation marks omitted.) *Monti* v. *Wenkert,* 287 Conn. 101, 135, 947 A.2d 261 (2008). For convenience, we refer to the Astriab Family Limited Partnership, Timothy D. Astriab and "Timothy D. Astriab d/b/a Glendale Farms" collectively as the defendants and to Timothy D. Astriab individually by name.

existed as to whether the defendants had notice of a horse's propensity to bite. We reverse the judgment of the trial court.

Mindful of the procedural posture of the case, we set forth the following facts as gleaned from the pleadings, affidavits and other proof submitted, viewed in a light most favorable to the plaintiffs. See *Martinelli* v. *Fusi*, 290 Conn. 347, 350, 963 A.2d 640 (2009). At all relevant times Astriab operated a business located at 203 Herbert Street in Milford (property) known as Glendale Farms. That business was open to the public and was twofold in nature. Glendale Farms sold annual flowers, vegetable plants, ground covers and seasonal ornamentals, and it also provided horse boarding services. The property contained, inter alia, greenhouses, stables and paddocks.[3] As manager and supervisor, Astriab oversaw operations at Glendale Farms.

Astriab testified in his deposition that customers of Glendale Farms enjoyed seeing the horses on the property and acknowledged that although he could have erected a barrier between the customers and the horses, he chose not to do so. Crystal Cobb, an employee at Glendale Farms and girlfriend of Astriab, similarly testified in her deposition that customers regularly asked to look at the horses after purchasing goods from the greenhouse. She explained that it was something that customers expected because "when they have little kids, they see the horse, they want to take a look."

The plaintiffs patronized Glendale Farms on the morning of May 18, 2006. At that time, the plaintiff son was two years old. After purchasing plants from the

---

[3] "A paddock is a small area (as a field) often enclosed and typically adjoining or near a building (as a house or stable) and often used for a pasture . . . [or] a turfed enclosure where horses are kept . . . ." (Internal quotation marks omitted.) *Ammirata* v. *Zoning Board of Appeals*, 264 Conn. 737, 740 n.4, 826 A.2d 170 (2003).

greenhouse, the plaintiff father placed the plants in their vehicle, which was located in a parking lot adjacent to a paddock containing three horses. The plaintiffs then walked over to the paddock and stood approximately one foot outside its fence to admire a brown horse known as Scuppy.[4] The plaintiff father petted Scuppy as the plaintiff son watched. The plaintiff father stopped petting Scuppy when the plaintiff son noticed another horse in the paddock.[5] Suddenly, and without warning, Scuppy lowered his head and bit the plaintiff son on his right cheek, removing a large portion of flesh. The injury ultimately required surgery and resulted in a permanent scar on the boy's right cheek.

The plaintiffs commenced the present action against the defendants on May 14, 2008.[6] Their complaint consisted of six counts. In counts one and three, the plaintiff son alleged negligence and recklessness on the part of Astriab.[7] In count two, the plaintiff father alleged a claim

[4] Although Cobb observed the plaintiffs walking over to the paddock, she did not say anything to them about approaching the horses.

[5] The plaintiff father testified during his July 20, 2009 deposition to the aforementioned facts. Although the plaintiffs did not append that testimony to their objection to the motion for summary judgment, the defendants quoted that particular testimony at length in their memorandum of law in support of their motion for summary judgment.

[6] The complaint alleged that the defendants were "the keeper, boarder and/or owner of [Scuppy, who] was being kept on or about the premises of Glendale Farms." In his deposition testimony, Astriab indicated that, at the time of the incident, he was the keeper of Scuppy, who was owned by Laura Pendleton. Pendleton is not a party to this action.

[7] The negligence count alleged in relevant part that the injuries suffered by the plaintiff son were caused by the failure of the defendants "to maintain their property in a reasonable safe condition for its lawful use and/or purpose free from defective, dangerous and unsafe conditions, in one or more of the following respects: (a) they failed to properly and adequately restrain and/or enclose horses in their stalls, and/or paddocks; (b) they failed to properly and adequately supervise and/or monitor the activity that was occurring on the premises of Glendale Farms, specifically that they allowed, enabled and/or caused patrons to roam on the premises without proper enclosure or restraint, warning signs or gates to prevent access to the horse area; (c) they allowed horses to roam unsupervised when they knew or should have known, that the horses could be dangerous and/or aggressive;

of bystander emotional distress against Astriab. Counts four, five and six were directed at the Astriab Family Limited Partnership and repeated the respective allegations of the first three counts.[8]

(d) they knew, or should have known, that allowing horses to roam unsupervised and/or to roam among those lawfully on the property, including the [p]laintiffs, would be likely to cause harm to those lawfully on the premises, including the [plaintiff son]; (e) on information and belief, they maintained a vicious and/or dangerous horse and/or horses upon the property . . . when they knew, or should have known, that doing so created a risk of injury to people lawfully on the property, including the [plaintiff son]; (f) on information and belief, the [d]efendants were aware of the vicious and/or dangerous propensities of [the horse that bit the plaintiff son], yet failed to restrain or remove said horse from the property; (g) the fencing used to restrain and/or enclose the horses in their paddocks did not adequately keep the horses in their paddocks; and/or prevent the horse from injuring someone standing outside the fenced paddock area: (h) [d]efendants as owner, boarder and/or keeper of a horse owed a duty of reasonable care to avoid harm to others caused by said horse; (i) [d]efendants failed to ensure that said horse was properly enclosed and/or restrained; (j) [t]he fencing used to enclose the paddock area did not adequately prevent the horses from putting their mouths/heads through the open areas and/or prevent the horses from lowering their heads to the area outside the fenced enclosure. (k) [t]hat the defendants failed to cordon off or block access to the areas where the horses were located and the dangerous conditions existed. . . . [Astriab] knew, or should have known prior to May 18, 2006, that the method by which they chose to restrain and/or enclose horses in their paddocks was inadequate, unsafe, dangerous, and/or defective, and likely to cause injury to persons lawfully upon the property controlled by [Astriab]."

[8] General Statutes § 52-557p, which concerns the assumption of risk by persons engaged in recreational equestrian activities, has no bearing on the present case, nor has any party so argued. That statute recognizes "the fact that there are certain risks that are inherent to horseback riding as a recreational activity . . . ." *Reardon* v. *Windswept Farm, LLC*, 280 Conn. 153, 166, 905 A.2d 1156 (2006). As our Supreme Court has explained, "the inherent unpredictability of a horse is something that the legislature already has considered in providing to an operator of a horseback riding facility a defense to a claim of negligence pursuant to the assumption of risk doctrine codified in § 52-557p. This protection granted by the legislature, however, does not permit the operator to avoid liability entirely for its negligence or that of its employees." Id., 167. Thus, under the plain language of § 52-557p, a negligence action may be maintained when the "injury was proximately caused by the negligence of the person providing the horse or horses to the individual engaged in recreational equestrian activities or the failure to guard or warn against a dangerous condition, use, structure or activity by the person providing the horse or horses or his agents or employees."

On October 2, 2009, the defendants filed a motion for summary judgment. That one sentence motion alleged that "there is no genuine issue as to any material fact and that the [d]efendants are entitled to judgment as a matter of law on the basis that they neither had actual notice nor constructive notice of any vicious disposition or propensities on the part of the . . . horse which allegedly bit the minor [p]laintiff." The defendants submitted the sworn affidavit of Astriab in support of that motion. In that affidavit, Astriab averred, inter alia, that "during the twenty-eight years that Glendale Farm[s] has kept horses, we have never had an episode where any of the horses we kept has bitten or otherwise injured any person." He further maintained that "[b]ecause I do not know the identity of [the horse] which bit the [plaintiff son], I have no way of knowing, and do not know, anything about the disposition or propensities of [the horse] before he bit the minor."[9]

The plaintiffs filed an opposition to the motion for summary judgment in the spring of 2010, in which they argued that "a horse, by its very nature, is capable of biting someone without provocation or predisposition and that this was known to the defendants." The affidavit of Bradley W. Amery, a doctor of veterinary medicine, was filed in support thereof and contained a detailed explanation as to a horse's propensity to bite.[10]

---

[9] The deposition testimony of Milford animal control officer Richard George, which the plaintiffs submitted in support of their opposition to the motion for summary judgment, indicates that although Scuppy was the only brown horse that regularly grazed in the paddock in question, he was removed from that paddock following the incident involving the plaintiffs. When George thereafter investigated Glendale Farms, multiple other brown horses were grazing in the paddock, and Astriab at that time informed him that those horses were in the paddock on the date of the incident. When apprised of the fact that Astriab later testified under oath that Scuppy was the only brown horse in the paddock on the date of the incident, George characterized Astriab's conduct during his investigation as misleading.

[10] In his affidavit, Amery explained that he was "very familiar with interaction with horses and am uniquely familiar with the propensities of horses to bite. . . . Biting is a natural part of horses' lives and horses can bite for

In addition, the plaintiff submitted portions of the respective deposition testimony of (1) Astriab; (2) Cobb; (3) Milford animal control officer Richard George; and (4) Captain Bernard L. Begley, Jr., of the Milford fire department. In his deposition testimony, Begley testified that he had been riding horses "all of my life." He stated that, in his experience, a horse can bite at any time, explaining that "[t]hey have been doing it . . . since the beginning of time, biting and kicking." For that reason, Begley always is careful to feed a horse either with a bucket or "palm up—I never put my fingers anywhere near the mouth of a horse." Consistent with the explanation provided in Amery's affidavit, Begley opined that a horse's propensity to bite is part of its nature.

In his deposition testimony, Astriab concurred with that assessment. He acknowledged that a horse, by its very nature, could harm a person who attempts to pet or feed them, stating that "a horse could bite you and cause great physical damage." He further acknowledged that he understood that even though a horse does

---

many reasons. Anatomically the horse has his eye located laterally on his head. While this provides a near 350 degree range of vision it does mean that there are two blind spots. These are directly in front of the horse's nose for approximately 3-4 feet, and directly behind the head creating a 10 degree blind spot behind the horse. This means that the horse doesn't see what he is grabbing and is reliant on the sensory input from his mouth. While the nervous system is fast it is unable to process all that information before the bite has occurred. Biting is also a common form of mutual grooming. Horses will usually stand facing opposite directions and use their teeth to both scratch and bite the other horse's back, neck and withers. This behavior can be easily replicated by a human scratching a horse's withers. Nipping is a term that is often applied to horses attracting attention. This behavior is generally believed to be the result of hand feeding treats. However, this behavior can be created by any form of positive reinforcement (like scratching their muzzle, or head, patting their neck or even verbal rewards) This nipping behavior can escalate if the persons attention is not on the horse to a full bite. In my experience most of the bites are not the result of aggressive, or nasty horses. They occur when the horse is being groomed, tacked up, being hand [fed] treats, or in pain."

not display a propensity to bite another person, horses by their nature could bite a person. He testified, based on his experience, that he was "well aware" that horses can bite people.

Astriab also indicated in his deposition testimony that Scuppy was the horse involved in the incident with the plaintiffs. Although he testified that he had no knowledge of Scuppy biting a person prior to the May 18, 2006 incident, he repeatedly described Scuppy as a "typical horse." When asked if Scuppy was different from other horses that would bite if a finger was put in front of him, Astriab answered, "[n]o." He acknowledged his concern that if someone made contact with Scuppy, whether to pet or feed him, he or she could get bit. When asked whether "a person who doesn't know Scuppy . . . can go up to Scuppy, put [his] hand out and the horse, being a horse, could bite that person," Astriab answered, "[y]es."

In rendering summary judgment in favor of the defendants, the court concluded that "the plaintiffs have failed to show, as they must, that the defendants were on notice that *Scuppy specifically, and not horses generally*, had a tendency to bite people or other horses. Therefore, the defendants owed no duty to the plaintiffs and are entitled to judgment on the plaintiff[s'] negligence claims as a matter of law." (Emphasis in original.) From that judgment, the plaintiffs now appeal.

Before considering the precise claim presented on appeal, we note the well established standard of review. "Practice Book § [17-49] requires that judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A material fact is a fact that will make a difference in the result of the case. . . . The facts at issue are those alleged

in the pleadings. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. . . . The party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. See Practice Book §§ [17-44 and 17-45]. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . A motion for summary judgment is properly granted if it raises at least one legally sufficient defense that would bar the plaintiff's claim and involves no triable issue of fact. . . . Our review of the trial court's decision to grant a motion for summary judgment is plenary." (Citation omitted; internal quotation marks omitted.) *Weiner* v. *Clinton*, 106 Conn. App. 379, 382–83, 942 A.2d 469 (2008).

The plaintiffs contend that the court improperly concluded that no genuine issue of material fact existed as to whether Astriab had notice of Scuppy's propensity to bite. More specifically, they claim that the court improperly held them to the standard applicable to cats by requiring the plaintiffs to establish that *"Scuppy specifically, and not horses generally,* had a tendency to bite people or other horses." (Emphasis in original.) As they cogently state in their appellate brief, "[t]he issue before this court is whether the plaintiffs can provide constructive notice through evidence of the normal characteristics of an animal or whether the plaintiff[s] must prove prior knowledge of viciousness of the specific animal." Astriab argues the latter, insisting that it is a "well established common-law rule [that] a plaintiff allege and prove that a specific animal must have exhibited prior vicious propensities and that its owner or keeper must have had knowledge (*scienter*) of those prior vicious propensities before recovery

can be made . . . ." (Emphasis in original.) By con-
trast, the plaintiffs, relying principally on *Bischoff* v.
*Cheney*, 89 Conn. 1, 92 A. 660 (1914), maintain that the
requisite notice may be established by proof of the
natural propensities of a species in cases involving
domestic animals such as horses.

I

Our analysis, therefore, begins with the seminal deci-
sion of our Supreme Court in *Bischoff*, which involved
an action to recover damages for injuries sustained by
a plaintiff who was bitten by the defendant's cat. At
the outset, the court noted that "negligence is the foun-
dation of an action of this character. If one keeps a
domestic animal having neither mischievous nor vicious
propensities, he will not be liable if the animal trespass
and do injury." Id., 4. A critical inquiry, the court
explained, concerns the natural inclinations of a partic-
ular species: "If the domestic animal belongs to a spe-
cies naturally inclined to do mischief or be vicious, or
if it be in fact vicious, and the owner have knowledge,
actual or constructive, of such propensity, it is his duty
to use reasonable care to restrain the animal in such
manner as to prevent its doing injury, and when he
permits the animal to go at large or to trespass, he fails
in his duty, and hence is liable for injury done by the
trespassing animal."[11] Id.

In conducting that inquiry, the court opined that
"[t]he cat is not of a species of domestic animals natu-
rally inclined to mischief, such as, for example, cattle,
whose instinct is to rove, and whose practice is to
eat and trample growing crops. The cat's disposition is

---

[11] *Bischoff* and its progeny are distinguishable in that they involved tres-
pass on the part of the domestic animal, whereas the present case involves
business invitees who regularly approached the domestic animals on the
property. Mindful of that distinction, we focus our attention on the substance
of the court's reasoning in *Bischoff* in an attempt to divine its proper applica-
tion to the issue at hand.

kindly and docile, and by nature it is one of the most tame and harmless of all domestic animals." Id., 5. Likewise, the court emphasized that "[n]othing in the record indicates that an Angora cat [such as the one that bit the plaintiff] is, naturally, either inclined to mischief or vicious." Id., 3. Accordingly, the court held that "no negligence can be attributed to the mere trespass of a cat which has neither mischievous nor vicious propensities, and consequently no liability attaches for such trespasses, since an owner cannot be compelled to anticipate and guard against the unknown and unusual." Id., 5.

In two subsequent cases that both involved cat bites, the Supreme Court applied that precedent. In *Pallman* v. *Great Atlantic & Pacific Tea Co.*, 117 Conn. 667, 167 A. 733 (1933), a one paragraph per curiam decision, the court cited *Bischoff* for the proposition that "[t]he defendant . . . would not be liable unless it knew or should have known that the cat was of a vicious or mischievous disposition and hence liable to attack people." Id., 668. Because the record in that case was "barren of any evidence tending to prove that the cat had, to the knowledge of the defendant or any of its servants or agents, ever before attacked any person or in any way displayed a vicious or mischievous disposition," the court concluded that the trial court properly had directed a verdict in favor of the defendant. Id. The court in *Pallman* understandably did not analyze whether "the domestic animal belongs to a species naturally inclined to do mischief or be vicious"; *Bischoff* v. *Cheney*, supra, 89 Conn. 4; because *Bischoff* already held that "[t]he cat is not of a species of domestic animals naturally inclined to mischief" or viciousness. Id., 5. Accordingly, the analysis in *Pallman* focused exclusively on the second consideration set forth in *Bischoff* by evaluating whether the cat in question "be in fact vicious" or mischievous.

More recently, in *Allen* v. *Cox*, 285 Conn. 603, 942 A.2d 296 (2008), the court considered whether knowledge that "a cat has a propensity to attack other cats . . . may render the owner liable for injuries to people that *foreseeably* result from such behavior."[12] (Emphasis in original.) Id., 617. After reviewing *Bischoff, Pallman*, related sibling authority and the Restatement (Second) of Torts, § 509, the court answered that query in the affirmative, holding that "under the specific circumstances" of the case; id., 609; in which the plaintiff "presented evidence that the defendants' cat previously had attacked other cats and that she was injured while trying to protect her cat from an attack by the defendants' cat"; id., 617; there existed "a genuine issue of material fact as to whether the defendants knew or should have known that their cat's vicious or mischievous propensities could lead it to injure a person." Id., 609.

Further discussion of those latter cases involving cat bites obscures the fact, first noted in *Bischoff* and repeated in *Allen*, that "[t]he cat's disposition is kindly and docile, and by nature it is one of the most tame and harmless of all domestic animals." (Internal quotation marks omitted.) Id., 611, quoting *Bischoff* v. *Cheney*, supra, 89 Conn. 5. In light of that tame and harmless nature, Connecticut law holds, absent "evidence tending to prove that the cat had, to the knowledge of the defendant or any of its servants or agents, ever before attacked . . . or in any way displayed a vicious or mischievous disposition"; *Pallman* v. *Great Atlantic & Pacific Tea Co.*, supra, 117 Conn. 668; that no liability normally attaches "since an owner cannot be compelled to anticipate and guard against the unknown and unusual." *Bischoff* v. *Cheney*, supra, 5; see also *Allen*

---

[12] As in *Pallman*, the court in *Allen* did not address whether the defendant's cat belonged to a species naturally inclined to do mischief or be vicious, but rather focused on whether the cat in question was in fact vicious.

v. *Cox*, supra, 285 Conn. 617 (liability for injuries sustained as result of cat bite limited to those that foreseeably result from such behavior). Because the present case does not involve that "most tame and harmless of all domestic animals"; *Bischoff* v. *Cheney*, supra, 5; the aforementioned precedent largely is inapposite.

## II

As shall be explained in greater detail, we concur with the plaintiffs' principal contention that a party in certain circumstances may establish the requisite notice, in a negligence action against the owner or keeper of a domestic animal, by proof of the natural propensities of that species. Our conclusion is guided by the precedent of our Supreme Court and the stated rationale underlying that precedent, as well as persuasive secondary authority.

We thus return to the two part inquiry set forth in *Bischoff*, namely, whether the defendants had notice that Scuppy either (1) "belongs to a species naturally inclined to do mischief or be vicious" or (2) "if it be in fact vicious . . . ."[13] Id., 4. If so, then "it is [their] duty to use reasonable care to restrain the animal in such manner as to prevent its doing injury . . . ." Id.; see also *Baldwin* v. *Ensign*, 49 Conn. 113, 117 (1881) ("[i]t is the duty of [one] who owns a vicious animal to give notice of his propensity or to restrain him; his omission to do so is negligence which makes him liable for the consequences"). Though expressly articulated in *Bischoff*, that twofold analytic approach was no new development. Rather, it remained part of the common law of this state for decades and dates back more than one and one-half centuries. For example, in *Barnum*

---

[13] We recognize that *Bischoff* was decided nearly one century ago. At the same time, "it is not the vintage but the vitality of precedent that is of significance." *Burton* v. *Stamford*, 115 Conn. App. 47, 58–59, 971 A.2d 739, cert. denied, 293 Conn. 912, 978 A.2d 1108 (2009).

v. *Vandusen*, 16 Conn. 200, 204 (1844), our Supreme Court recognized the "undoubted" principle "that the owner of a domestic animal, not naturally inclined to commit mischief, is not liable for an injury committed by it, unless he has notice that such animal is accustomed to commit mischief . . . ." See also *Baldwin* v. *Ensign*, supra, 116. Implicit in—and essential to—that principle is the demarcation between those domestic animals not inclined to commit mischief and those that possess natural inclinations to the contrary. For that reason, the court in *Bischoff* explained that actual or constructive notice that "the domestic animal belongs to a species naturally inclined to do mischief or be vicious" can give rise to a duty of care. *Bischoff* v. *Cheney*, supra, 89 Conn. 4.

As our Supreme Court has observed, "[a]lthough it has been said that no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised." (Citation omitted; internal quotation marks omitted.) *Allen* v. *Cox*, supra, 285 Conn. 610. In *Bischoff*, the court plainly indicated that its distinction between a domestic animal that does not belong "to a species naturally inclined to do mischief or be vicious" and one that "be in fact vicious"; *Bischoff* v. *Cheney*, supra, 89 Conn. 4; is predicated on the threshold inquiry of foreseeability. As it stated: "[N]o negligence can be attributed to the mere trespass of a cat which has neither mischievous nor vicious propensities, and consequently no liability attaches for such trespasses, *since an owner cannot be compelled to anticipate and guard against the unknown and unusual.*" (Emphasis added.) Id., 5. It follows, then, that if the domestic animal involved in a given dispute belongs to a species

naturally inclined to do mischief or be vicious, an owner or keeper has a duty to guard against the known and usual tendencies of the animal. Put differently, an owner or keeper's knowledge of the natural inclinations of a particular species may render certain injuries foreseeable.

In that sense, the precedent of our Supreme Court is entirely consonant with the position articulated in the Restatement (Second) of Torts, § 518. Titled "Liability for Harm Done by Domestic Animals That Are Not Abnormally Dangerous," § 518 provides: "Except for animal trespass, one who possesses or harbors a domestic animal that he does not know or have reason to know to be abnormally dangerous, is subject to liability for harm done by the animal if, but only if, (a) he *intentionally causes the animal to do the harm*, or (b) he is negligent in failing to prevent the harm." 3 Restatement (Second), Torts § 518 (1977). Whereas §§ 504 and 505 of that volume address strict liability for trespass of livestock and § 509 pertains to strict liability for abnormally dangerous domestic animals, § 518 embodies the principle, articulated in *Bischoff* v. *Cheney*, supra, 89 Conn. 4, and *Baldwin* v. *Ensign*, supra, 49 Conn. 117, that the ground for injuries arising from a domestic animal that is not abnormally dangerous, but rather merely possesses a dangerous propensity normal to its class, is negligence.

The commentary to § 518, being both revealing and pertinent to the issue before us, merits discussion. Comment (e) states: "Section [518] is applicable to those domestic animals of a class that can be confined to the premises of their keepers or otherwise kept under constant control without seriously affecting their usefulness and which are not abnormally dangerous. Although the utility of these animals is sufficient to justify their being kept without risk of the strict liability stated in § 509, many of them are recognizably likely to

do substantial harm while out of control and, therefore, their keepers are under a duty to exercise reasonable care to have them under a constant and effective control. Thus there is a likelihood that even a well-broken mare or gelding that had never shown a propensity to bite or kick may do so when running loose. This is sufficient to require its keeper to exercise reasonable care to keep it under constant control." 3 Restatement (Second), supra, § 518, comment (e), p. 31. As to the amount of care required, comment (f) indicates that "[t]he amount of care that the keeper of a domestic animal is required to exercise in its custody is commensurate with the character of the animal"; id., comment (f), p. 31; and comment (g) expands on that point, stating that "[i]n determining the care that the keeper of a not abnormally dangerous domestic animal is required to exercise to keep it under control, *the characteristics that are normal to its class are decisive, and one who keeps the animal is required to know the characteristics*."[14] (Emphasis added.) Id., comment (g). Last, comment (h) explains that "[o]ne who keeps a domestic animal that possesses only those dangerous propensities that are normal to its class is required to know its normal habits and tendencies. He is therefore required to realize that even ordinarily gentle animals are likely to be dangerous under particular circumstances and to exercise reasonable care to prevent foreseeable harm." Id., comment (h), pp. 31–32. Thus, the Restatement, like the precedent of our Supreme Court, recognizes that notice of the natural inclinations of a species may give rise to a duty of care involving domestic animals.

---

[14] As one commentator observed, because "the situational complexity of any given biting incident makes us sensitive to the fact that, without language, we are truly guessing at what is going on [inside the animal's mind]"; G. Duckler, "Animal Wrongdoings: On Holding Animals to (and Excusing Them From) Legal Responsibility for their Intentional Acts," 2 J. Animal L. & Ethics 91, 110 (May 2007); "[p]resumptions about and inferences from behavior are often the only means left to determine intent when speech itself is unavailable . . . ." Id., 109.

The trial court in the present case held to the contrary, concluding that the plaintiffs were required to show that the defendants knew that "Scuppy specifically, and not horses generally, had a tendency to bite people or other horses" in order to establish the requisite duty of care. In so doing, the court relied on *Allen* v. *Cox*, supra, 285 Conn. 603, and § 509 of the Restatement (Second) of Torts. The analysis contained therein suggests that the court did not appreciate the distinction, recognized throughout this country, between actions predicated on strict liability and ones based on a theory of negligence, as exemplified by §§ 509 and 518 respectively of the Restatement. As the Supreme Court of Washington explained, "[t]he Restatement (Second) of Torts (1977) recognizes two separate causes of action regarding injury caused by animals. First, according to section 509, if the [animal] has known dangerous propensities abnormal to its class, the owner is strictly liable. Second, section 518 provides that if there are no known abnormally dangerous propensities, the owner is liable only if he is negligent in failing to prevent the harm. The amount of care required is commensurate with the character of the animal." *Arnold* v. *Laird*, 94 Wn. 2d 867, 871, 621 P.2d 138 (1980); see also *Dolezal* v. *Carbrey*, 161 Ariz. 365, 370, 778 P.2d 1261 (App. 1989) (noting distinction between §§ 509 and 518 of Restatement); *Schwartz* v. *Erpf Estate*, 255 App. Div. 2d 35, 37, 688 N.Y.S.2d 55 (discussing "two distinct theories applicable in cases where injury is caused by animals" under §§ 509 and 518 of Restatement), leave to appeal dismissed, 94 N.Y.2d 796, 722 N.E.2d 508, 700 N.Y.S.2d 428 (1999).

The defining characteristic of liability arising under § 509 of the Restatement is that it "imposes strict liability upon a possessor of a domestic animal only when the possessor knows, or has reason to know, that the animal has dangerous propensities *abnormal to its*

*class.*" (Emphasis added; internal quotation marks omitted.) *Pullan* v. *Steinmetz*, 16 P.3d 1245, 1247 (Utah 2000). In a number of jurisdictions, that "strict liability rule of vicious propensity is viewed as co-existing with certain types of claims alleging negligence in the care and maintenance of an animal that causes damage." *Schwartz* v. *Erpf Estate*, supra, 255 App. Div. 2d 37; see also *Hardin* v. *Christy*, 462 N.E.2d 256, 258 (Ind. App. 1984) (action containing negligence and strict liability counts for injuries sustained during attack by horse); *Gunpowder Horse Stables, Inc.* v. *State Farm Automobile Ins. Co.*, 108 Md. App. 612, 633, 673 A.2d 721 (1996) ("[t]he common law of Maryland recognizes only two causes of action against an owner of a domestic animal: negligence and strict liability"); *Pullan* v. *Steinmetz*, supra, 1247 (action containing negligence and strict liability counts for injuries sustained during attack by horse).

Complicating the resolution of the case before us is the fact that Connecticut has not adopted the strict liability standard set forth in § 509 for domestic animals with dangerous propensities abnormal to their class. Rather, under our law "negligence is the foundation of an action" arising from injuries sustained in an attack by a domestic animal. *Bischoff* v. *Cheney*, supra, 89 Conn. 4; see also *Baldwin* v. *Ensign*, supra, 49 Conn. 117. In *Bischoff*, our Supreme Court acknowledged that some jurisdictions permit parties to proceed on a theory of strict liability and "make the owner an insurer against damage by a mischievous or vicious domestic animal in the same way as against damage done by an animal *ferae naturae*," but clarified that "our law has not adopted this harsh doctrine." (Emphasis in original.) *Bischoff* v. *Cheney*, supra, 4.

A further obstacle before the trial court was the fact that, as best we can tell, no Connecticut court has considered the applicability of § 518 of the Restatement

(Second) of Torts in any context. Sibling jurisdictions confronting cases similar to the one presently before us have done so, and those cases inform our analysis.

For example, in *Sybesma* v. *Sybesma*, 534 N.W.2d 355, 356 (S.D. 1995), the Supreme Court of South Dakota considered a civil action in which the plaintiff had been "trampled by a stock cow." After noting that "[u]nder South Dakota law a cause of action by someone injured by a domestic animal can arise under a theory of strict liability or negligence," the court stated that the plaintiff "sued under a theory of negligence, claiming that [the defendant] was negligent in keeping, harboring, and transporting the animal, in failing to adequately warn [her], and in failing to properly instruct [her]." Id., 357. Accordingly, the court determined that "the theory of strict liability [set forth in § 509] does not apply." Id. Rather, it explained, "[l]iability in negligence for domestic animals is found in § 518 of the Restatement (Second) [of Torts]." Id. After reviewing that authority, the Supreme Court of South Dakota considered whether the trial court had improperly "instructed the jury on the general theory of negligence [by] rejecting [the defendant's] requested instruction which would have imposed a requirement that the jury find the owner had knowledge that *the specific animal* had vicious or dangerous propensities." (Emphasis added.) Id., 358. The court rejected that claim, noting, consistent with the commentary to § 518, that "[t]he evidence revealed these animals were stock cattle, not more docile dairy cattle. Additionally, [the defendant] acknowledged that he . . . had [a] substantial understanding of the occasionally difficult nature of stock cows . . . ." Id. Thus, in affirming the judgment in favor of the plaintiff, the Supreme Court of South Dakota held that, as with § 518 of the Restatement, notice of the natural inclinations of a species may give rise to a duty of care involving domestic animals.

The Supreme Court of Wisconsin reached a similar result in *White* v. *Leeder*, 149 Wis. 2d 948, 440 N.W.2d 557 (1989). In that case, the plaintiff was attacked by a charging bull in a barn on the defendant's property. Id., 952. At trial, "witnesses for both parties testified that bulls are dangerous and unpredictable. There was no evidence presented that this bull had attacked anyone prior to this incident, and in fact [the plaintiff] testified that the bull had not presented any particular problems during the ten months the bull had been on the farm." Id. In addition, "[e]vidence was also presented in an attempt to show that the bull could have been kept in a different manner to prevent an accident." Id., 953. In analyzing the defendant's challenge to the jury instructions on negligence, the court began by noting that "[a]t common law, the cases have established that the owner or keeper of a domesticated animal is held to anticipate the general propensities of the class to which the animal belongs, as well as any unusual traits or habits of the individual animal. . . . The common-law rule first requires the owner or keeper to use ordinary care in controlling the characteristics normal to the animal's class." (Citation omitted.) Id., 955. Because "[i]n the present case, the trial court determined that the evidence established that bulls are dangerous and by their very nature possess propensities likely to result in injury," the court held that the jury properly was instructed on liability for harm done by domestic animals.[15] Id., 956–57; accord *Dolezal* v. *Carbrey*, supra,

---

[15] The defendants' reliance on *Peterson* v. *Eichhorn*, 344 Mont. 540, 189 P.3d 615 (2008), is misplaced, as the court in that fact specific case held that irrespective of the dangerous propensities of the particular class of animal, the plaintiff had "failed to present substantial evidence that would establish that [the defendant] breached [the] duty [of care] under the circumstances here"; id., 551; when the defendant's property contained (1) a metal gate at the entrance to the driveway; (2) a fence surrounding the pasture that partially abutted the plaintiff's property, (3) an electric fence along that portion of the pasture which abutted the plaintiff's property; id., 541–42; and (4) "a separately fenced corral . . . ." Id., 542. The record further demonstrated that the plaintiff had experience herding horses on the defen-

161 Ariz. 369 ("Arizona courts have required the owner or keeper of the animal to know the normal habits and tendencies of animals of its class, realizing that even ordinarily gentle animals are likely to be dangerous under particular circumstances" [internal quotation marks omitted]); *Duren* v. *Kunkel*, 814 S.W.2d 935, 938 (Mo. 1991) (en banc) (rejecting claim that negligence action cannot be maintained absent "actual or constructive knowledge of the animal's abnormally vicious propensities"); *Diaz* v. *McMahon*, 112 N.M. 788, 791, 819 P.2d 1346 (App. 1991) (rejecting "defendants' argument that under the facts herein they were entitled to summary judgment because the individual cow in question had no known propensity to kick"); *State* v. *Taylor*, 322 S.W.3d 702, 707 (Tex. App. 2010) ("[t]he common law . . . recognizes that the owner of a domestic animal should realize that even ordinarily gentle animals are likely to be dangerous under particular circumstances and should exercise reasonable care to prevent foreseeable harm").

*Williams* v. *Tysinger*, 328 N.C. 55, 399 S.E.2d 108 (1991), involved injuries to a business invitee by the hoof of a horse. That case involved two young children, who "had never been around horses [and did] not know of [the] dangers" posed by "the general propensities" of that class of animal. (Internal quotation marks omitted.) Id., 60; cf. *Schwartz* v. *Erpf Estate*, supra, 255 App. Div. 2d 39–40 ("by virtue of their size alone, horses in their

dant's property in the past. Id., 541. On the date of her injury, it was only after she entered the defendant's property and "took the gratuitous step of stopping to throw some hay to [the animal] and the other horses in the [separately fenced] corral" that the plaintiff was injured by a horse inside that corral. Id., 550. In addition, the court rejected the plaintiff's strict liability claim that the horse in question possessed a dangerous tendency "abnormal for horses in general," noting the trial court's finding that "a horse by nature possesses the ability, if not the propensity, to bite" and that "such dangers [are] normal for its class or category." (Internal quotation marks omitted.) Id., 544.

normal activities pose a distinct type of threat to small children who are unaware of the hazards they present, distinguishable in kind from the dangers presented by house pets such as dogs and cats"). In *Williams*, the plaintiff and her family visited the defendants' property as business invitees to check on an order of lumber placed with the defendants. At that time, the defendants "suggested that [the plaintiff's] boys go around to the pasture . . . and play with the horse . . . kept there." *Williams* v. *Tysinger*, supra, 56–57. When the plaintiff informed the defendants that her children had "never been around any animals," the defendants "assured [her] one hundred percent that the animal would not hurt nobody." (Internal quotation marks omitted.) Id., 57. The two boys headed out to the pasture and "began petting the forehead of the horse and feeding it some grass. The horse walked away from the fence, and [the plaintiff's nine year old son] crawled under the fence to pet the horse some more. . . . The horse stood on its front legs and kicked [the boy]." Id. Litigation followed, and the trial court ultimately directed a verdict in favor of the defendants following the presentation of the plaintiff's case-in-chief, concluding—as did the trial court in the present case—that the plaintiff "failed to make a showing that defendants had any prior knowledge, actual or constructive, that *their horse* had any dangerous or vicious propensities." (Emphasis added.) Id., 56.

On appeal, the Supreme Court of North Carolina framed the issue before it as "whether plaintiff under the facts of this case has to make a showing of the dangerous propensities of the horse and the owner's knowledge of these propensities in order to recover." Id., 59. It explained that "[t]he knowledge by the owner of the vicious propensities of his horse is not always essential to a recovery in an action for injuries alleged to have been caused by the owner's negligence. . . .

Thus, not all actions seeking recovery for damage caused by a domestic animal need involve the vicious propensity rule. . . . [T]he accepted rule is [t]he owner of a domestic animal is chargeable with knowledge of the general propensities of certain animals and he must exercise due care to prevent injury from reasonably anticipated conduct." (Citations omitted; internal quotation marks omitted.) Id. Without mentioning § 518 of the Restatement, the court echoed its emphasis on the "knowledge of the general propensities of the horse." Id., 60. The court explained that "the question of defendants' negligence in the present case does not depend upon defendants' knowledge of the horse's vicious or dangerous propensities, and it was not necessary that such evidence be presented. The gravamen of this action is not the wrongful keeping of a vicious animal; rather the gravamen is the encouraging of two young children to play with a horse after being warned by the children's mother that they had no familiarity with horses or any other large animals. . . . [The] defendants, as the owners of the horse, are chargeable with knowledge of the general propensities of the horse." (Internal quotation marks omitted.) Id., 59–60. In light of a horse's natural propensity to kick, the Supreme Court of North Carolina held that the trial court "erred in granting defendants' motion for directed verdict [because] the question of defendants' negligence in [permitting the boys] to play with the horse is a question for the jury." Id., 60. Cases such as *Williams* and *White* v. *Leeder*, supra, 149 Wis. 2d 948, exemplify the precept, consistent with the Restatement view, that "[k]nowledge by an owner of the vicious propensities of his or her particular animal is not always essential to a recovery in an action for injuries alleged to have been caused by the owner's negligence. The owner of a domestic animal is chargeable with knowledge of the general propensities of certain animals and he or she must

exercise due care to prevent injury from reasonably anticipated conduct." 4 Am. Jur. 2d 434, Animals § 68 (2007).

A final matter relevant to the inquiry at hand concerns the definition of viciousness in the context of domestic animals. It is well established that a vicious or mischievous propensity in that context is simply "a propensity or tendency of an animal to do any act that might endanger the safety of the persons and property of others in a given situation; and any propensity on the part of a domestic animal, which is likely to cause injury to human beings under the circumstances in which the party controlling the animal places him, is a dangerous or vicious propensity." 3B C.J.S. 398, Animals § 323 (2003). "It is the act of the animal and not the state of mind of the animal from which the effects of a dangerous propensity must be determined. Thus, although an animal is actuated solely by mischievousness or playfulness, rather than maliciousness or ferociousness, yet, if it has a tendency to do a dangerous or harmful act, it has a vicious propensity within the meaning of the rule holding the owner or keeper liable for injuries resulting from vicious propensities of which he has knowledge." Id.; see also *Owen* v. *Hampson,* 258 Ala. 228, 232, 62 So. 2d 245 (1952) ("the law makes no distinction between an animal dangerous from viciousness and one merely mischievous or dangerous from playfulness, but puts on the owner of both the duty of restraint when he knows of the animal's propensities"); *Groner* v. *Hedrick,* 403 Pa. 148, 151, 169 A.2d 302 (1961) ("[s]ince intention forms no part of an animal's assault and battery, the mood in which it inflicts harm is immaterial, so far as the owner's duty goes"). Similarly, this court in *Mann* v. *Regan,* 108 Conn. App. 566, 580, 948 A.2d 1075 (2008), held that "[a] vicious propensity is any propensity . . . that is likely to cause injury under the circumstances." We further indicated that there exists

no "meaningful distinction between the words 'vicious' and 'dangerous' as used in the context of an action stemming from a . . . bite" by a domestic animal. Id., 577.

### III

With that additional context in mind, we return yet again to the two part inquiry set forth in *Bischoff* and consider whether a genuine issue of material fact exists as to whether the defendants had notice that Scuppy either (1) "belongs to a species naturally inclined to do mischief or be vicious" or (2) "if it be in fact vicious . . . ." *Bischoff* v. *Cheney*, supra, 89 Conn. 4. The task that remains is to give meaning to both prongs of that near-century old inquiry.

We begin with the latter prong. In inquiring whether the owner or keeper of a domestic animal had notice that the animal in question "be in fact vicious," that prong comports with § 509 of the Restatement, which holds liable "[a] possessor of a domestic animal that he knows or has reason to know has dangerous propensities abnormal to its class . . . ." 3 Restatement (Second), supra, § 509 (1). Thus, one who keeps a domestic animal that either "is vicious, that is, has a tendency to attack human beings or other animals that is abnormal in animals of its class" or "is not vicious but has a dangerous tendency that is unusual"; 3 Restatement (Second), supra, § 509, comment (c), p. 16; faces liability upon notice that the specific animal "be in fact" vicious. *Bischoff* v. *Cheney*, supra, 89 Conn. 4.

By contrast, the first prong of the *Bischoff* inquiry asks whether the domestic animal in question belongs to a species naturally inclined to do mischief or be vicious. Id. For that reason, § 509 (1) of the Restatement, which addresses animals with tendencies "abnormal to its class," is inapplicable to that query. Rather, § 518, which concerns domestic animals that possess "only

those dangerous propensities that are normal to its class"; 3 Restatement (Second), supra, § 518, comment (h), p. 31; is entirely consistent with the first prong of the *Bischoff* inquiry. Indeed, our Supreme Court in *Bischoff* essentially applied that first prong to the facts before it by contrasting the docile propensities normal to cats with the dangerous propensities normal to cattle. As it stated: "The cat is not of a species of domestic animals naturally inclined to mischief, such as, for example, cattle, whose instinct is to rove, and whose practice is to eat and trample growing crops. The cat's disposition is kindly and docile, and by nature it is one of the most tame and harmless of all domestic animals." *Bischoff* v. *Cheney*, supra, 89 Conn. 5. In so doing, the court implicitly acknowledged that "[i]n determining the care that the keeper of a not abnormally dangerous domestic animal is required to exercise to keep it under control, the characteristics that are normal to its class are decisive . . . ." 3 Restatement (Second), supra, § 518, comment (g), p. 31.

The rationale underlying the *Bischoff* two part inquiry, as well as that underlying § 518 of the Restatement, relates to foreseeability. In light of the characteristics normal to cats, which are "kindly and docile, and by nature . . . one of the most tame and harmless of all domestic animals"; *Bischoff* v. *Cheney*, supra, 89 Conn. 5; and not "inclined to do mischief or be vicious"; id., 4; our Supreme Court held that "no negligence can be attributed to the mere trespass of a cat which has neither mischievous nor vicious propensities, and consequently no liability attaches for such trespasses, since an owner cannot be compelled to anticipate and guard against the unknown and unusual." Id., 5. Because foreseeability is the touchstone of duty, it follows that if a particular domestic animal belongs to a class that has dangerous propensities, an owner can be compelled to anticipate and guard against those

known and usual tendencies. An owner's or keeper's knowledge that a domestic animal "belongs to a species naturally inclined to do mischief or be vicious"; id., 4; thus may render certain injuries foreseeable. See, e.g., *Gunpowder Horse Stables, Inc.* v. *State Farm Automobile Ins. Co.*, supra, 108 Md. App. 625 (in negligence claim involving domestic animal, "[a]ll that the law requires to be shown . . . is that the owner's negligence be the proximate cause of the injury which could reasonably have been anticipated" [internal quotation marks omitted]); *Diaz* v. *McMahon*, supra, 112 N.M. 791 ("the foreseeability requirement of negligence actions necessitates some showing that defendants knew or should have known that harm could result"); *Schwartz* v. *Erpf Estate*, supra, 255 App. Div. 2d 39 ("[A] property owner has the right to use his property as he sees fit. However, if in doing so he creates or permits dangerous activities, instrumentalities, or conditions to exist on the premises, he must take reasonable measures to prevent injury to those whose presence on the property can be reasonably foreseen . . . ." [Citation omitted.]); *Williams* v. *Tysinger*, supra, 328 N.C. 59 (owner of domestic animal is chargeable with knowledge of general propensities of certain animals and must exercise due care to prevent injury from reasonably anticipated conduct); *Arnold* v. *Laird*, supra, 94 Wn. 2d 871 ("negligence cause of action arises when there is ineffective control of an animal in a situation where it would reasonably be expected that an injury could occur"); 4 Am. Jur. 2d, supra, § 72 ("[l]iability in negligence for injuries sustained from a domestic animal will not attach unless the injured party can demonstrate . . . that the injury could reasonably and foreseeably have been anticipated by the owner or keeper of the domestic animal"); 3B C.J.S., supra, § 327 ("[a]n owner of an animal may be negligent if the owner fails to exercise reasonable care in controlling the animal, in a situation where it would reasonably be expected that the injury could occur").

*Bischoff* instructs that a negligence claim concerning an injury inflicted by a domestic animal involves inquiry not only into whether the possessor knew that the specific animal in question was vicious, but also into whether it belongs to a class with dangerous propensities. The trial court therefore improperly concluded that the plaintiffs were required to show that "Scuppy specifically, and not horses generally," possessed a natural tendency to bite in order to survive summary judgment.

The plaintiffs in the present case steadfastly have maintained that Scuppy is a domestic animal that possesses a dangerous propensity normal to its class. To paraphrase *Bischoff*, their contention is that Scuppy belongs to a species naturally inclined to do mischief or be vicious. As applied to the facts of this case, § 518 of the Restatement thus required the defendants to exercise a degree of care over Scuppy "commensurate with the character of the animal"; 3 Restatement (Second), supra, § 518, comment (f), p. 31; a measure under which the "characteristics that are normal to its class are decisive . . . ." Id., comment (g), p. 31. The defendants further were "required to know the characteristics" of the species; id.; and "its normal habits and tendencies." Id., comment (h), p. 31. The defendants had a duty "to realize that even ordinarily gentle animals are likely to be dangerous under particular circumstances and to exercise reasonable care to prevent foreseeable harm"; id., pp. 31–32; such as the "likelihood that even a well-broken mare or gelding that had never shown a propensity to bite . . . may do so" in certain circumstances. Id., comment (e), p. 31.

Viewed in a light most favorable to the plaintiffs, the pleadings, affidavits and other proof submitted demonstrate that a genuine issue of material fact existed as to whether horses possess a natural tendency to bite. In his affidavit, Amery, a doctor of veterinary medicine, provided a detailed description of "the propensities of

horses to bite."[16] A lifelong horseman, Begley similarly testified in his deposition that a horse can bite at any time, explaining that "[t]hey have been doing it . . . since the beginning of time, biting and kicking." For that reason, Begley explained that he always fed a horse either with a bucket or "palm up—I never put my fingers anywhere near the mouth of a horse." He further testified that a horse's propensity to bite is part of its nature.

In his deposition testimony, Astriab corroborated that assessment. He acknowledged that horses, by their very nature, could harm a person who attempted to pet or feed them, stating that "a horse could bite you and cause great physical damage." He understood that even though a particular horse had not previously displayed a propensity to bite, horses by their very nature could bite a person. Based on his experience, Astriab was "well aware" that horses can bite people. He also testified that although he had no knowledge of Scuppy biting a person prior to the May 18, 2006 incident, Scuppy was no different from other horses that would bite if a finger was put in front of him. Significantly, Astriab acknowledged his concern that if someone made contact with Scuppy, whether to pet or feed him, they could get bit. When asked whether "a person who doesn't know Scuppy . . . can go up to Scuppy, put [his] hand out and the horse, being a horse, could bite that person," Astriab answered, "[y]es." Although cognizant of the

---

[16] In their appellate brief, the defendants argue that Amery's affidavit is not competent evidence, as it failed to show that he was competent to testify to the matters stated therein, as "there is no indication if he is a doctor of medicine, chiropractics or philosophy." That contention is improper for two reasons. First, the defendants never raised any such objection before the trial court. See *New Haven* v. *Bonner*, 272 Conn. 489, 497–99, 863 A.2d 680 (2005) (declining to consider alternate ground for affirmance that was not raised before trial court). Second, it is undisputed that the plaintiffs' May 3, 2010 expert disclosure of Amery, filed prior to the affidavit in question, plainly stated that the grounds for his opinions were "based upon his education, training and experience as an equine veterinary doctor."

fact that customers of Glendale Farms enjoyed seeing the horses on the property and mindful that he could have erected a barrier between the customers and the horses, Astriab testified that he chose not to do so.

Thus, the evidence before the court indicates that a genuine issue of material fact existed as to whether horses as a class possess a natural tendency to bite, possibly causing great physical damage to a person, even if a particular horse had not previously displayed that propensity. Accord 3 Restatement (Second), supra, § 518, comment (e), p. 31 (recognizing "likelihood that even a well-broken mare or gelding that had never shown a propensity to bite . . . may do so" in certain circumstances). Because that propensity is one that might endanger the safety of person or property in a given situation; see *Mann* v. *Regan*, supra, 108 Conn. App. 580; it necessarily is a vicious propensity, albeit one normal to its class. Unlike the cat in *Bischoff*, which by its nature is "one of the most tame and harmless of all domestic animals"; *Bischoff* v. *Cheney*, supra, 89 Conn. 5; Astriab's own testimony demonstrates that Scuppy belongs to "a species naturally inclined to do mischief or be vicious . . . ." Id., 4. Viewed in the light most favorable to the plaintiffs, Astriab's testimony thus indicates that the injury suffered by the plaintiff son was a foreseeable one, and the defendants had a "duty to use reasonable care to restrain the animal in such a manner as to prevent its doing injury . . . ." Id.

Under Connecticut law, the existence of both actual and constructive notice is a question of fact. *Reiner, Reiner & Bendett, P.C.* v. *Cadle Co.*, 278 Conn. 92, 107–108, 897 A.2d 58 (2006); *Nicefaro* v. *New Haven*, 116 Conn. App. 610, 613, 976 A.2d 75, cert. denied, 293 Conn. 937, 981 A.2d 1079 (2009). On the evidence presented in this case, a genuine issue of material fact exists as to whether the defendants had notice that Scuppy belonged to a class of domestic animal that

possessed a natural propensity to bite, thereby endangering customers such as the plaintiffs invited onto their property. Accordingly, the court improperly rendered summary judgment in favor of the defendants.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.