CLARENCE N. ROSENTHAL, AS TRUSTEE TO MAINTAIN ACTION FOR DEATH OF WILLIAM A. ROSENTHAL, AND ANOTHER v. HILL TOP RIDING ACADEMY, INC., AND ANOTHER.

110 N. W. (2d) 854.

September 15, 1961—No. 38,128.

---

[4]State v. Clow, 215 Minn. 380, 10 N. W. (2d) 359.
[5]Cronquist v. City of Minneapolis, 258 Minn. 30, 102 N. W. (2d) 512.
[6]Minn. St. 547.01 (1).

*Allen & Courtney,* for appellants.
*Earl J. Maxwell,* for respondents.

DELL, CHIEF JUSTICE.

This is an action brought by decedent's father individually and also as statutory trustee to recover damages for the wrongful death of his son, William A. Rosenthal. Plaintiffs appeal from an order denying their motion for a new trial as to the defendants Hill Top Riding Academy, Inc., and Frank Newman. They will be referred to as the defendants.

On April 22, 1958, the son, who will be referred to as the decedent, was driving a motor scooter west on County Road B in Ramsey County at approximately 7:50 p. m. At the same time John Lichtscheidl was on a saddle horse on the shoulder of the north side of the road waiting for the scooter to pass by. The horse he was riding was one rented from the Hill Top Riding Academy, Inc. At that time the horse was "bobbing its head from side to side and wanted to go." When the scooter was about 5 feet away the horse, apparently because of the time of day and frightened by the scooter as well as the noise made by it, jumped out onto the road. The scooter collided with it, throwing the decedent to the road. He suffered a basal skull fracture and died 15 months later without regaining consciousness.

At the time of the accident Lichtscheidl, who was 17 years of age,

was accompanied by two companions about his age, also riding saddle horses. The defendant Frank Newman, a guide employed by Hill Top, was riding with them. Lichtscheidl had ridden horses five or six times before but, according to his testimony, had never taken riding lessons. On at least one previous occasion he had ridden at Hill Top. The horse furnished Lichtscheidl was 12 years old and gentle. At the beginning of the ride Newman told the party to keep away from traffic and to stay as far over on the shoulder of the road as they could. He led the party on a trail which ran to County Road B, then along the south side of the road for a distance of 300 to 400 feet, and then across the road to a resting place where they stopped. While on the south side of the road and again on the north side, Lichtscheidl complained to Newman that his horse was "getting out of line" and that he was having trouble controlling it. Newman said that "the horse would be all right in a little while." At the time of the accident the party was returning to the stable and had been moving west on the north shoulder of the road. When the scooter approached Newman told the riders to get over to the side of the road as far as they could and to let the scooter pass before crossing it. The evidence was conflicting as to light conditions at the time of the accident. The party left the stable around 7 p. m. and was scheduled to return in about an hour. A weather report introduced in evidence by the plaintiff showed that the sun set at 7:07 p. m. Lichtscheidl testified that at the time of the accident the sun had set and "[i]t was pretty well dark out." Newman testified that it was still daylight and that the visibility was good. The testimony of other witnesses likewise varied. There was evidence from which the jury could find that the speed of the scooter was within the posted speed limit in that area. In directing a verdict in favor of all of the defendants, the trial court stated: "Certainly the question of the condition of light ordinarily would be a jury issue."

Plaintiffs contend that the defendants were negligent in permitting an inexperienced 17-year-old boy to be riding one of their horses at the edge of a suburban road at the time the accident occurred. In so contending, in addition to the evidence already referred to, they point to the following evidence. Lichtscheidl was having trouble with his horse for some time. It was "always getting out of line" and "jumping back

and forth," and he was having some difficulty controlling it. When he complained to Newman about that he was told that "the horse would be all right in a little while."

George Gunderson, an employee of Hill Top, even though he admitted that "it was getting dark" and that the stable had a rule "that the horses are not to be out on the road at dusk or dark," authorized Newman to take Lichtscheidl and his companions out on the trail ride, but in doing so, called Newman's attention to the time of day and said, "They [the party] had to be off the County Road B [where the accident occurred] before dark." He further told Newman "to go out on the road and to do so first and then come in and then finish up the ride in the pasture before that hour was up. That was the instructions I gave him."

Walter Westman, manager of Hill Top, who had been in "this riding stable business" for 24 years, testified that he "didn't like horses out on the road after dark." He felt that an experienced rider would be safe enough but that an inexperienced rider might create a hazard, and it would be dangerous for him to be out on the road after dark. He also said that they didn't allow horses on the road after dark unless the riders had "enough experience in riding so they understand the conditions they are under when it is dark." He also testified:

"Q. But as far as the help is concerned, ever since you have been in operation out there for this 24 years you have had the rule in effect that your horses were not to be out on the road after dark, is that correct?

"A. Yes.

"Q. And the reason for that rule you stated on Friday, is that an inexperienced rider on a horse along the road after dark may be a hazard. Is that correct?

"A. Yes, I believe so.

"Q. And a hazard to himself or to motorists upon the highway or to both?

"A. Could be a hazard to himself. It could be a hazard to me. It could be a hazard to motorists.

"Q. And, of course, County Road B which is the road that we're talking about here, is an improved blacktop road, is that correct?

"A.   Yes."

The trial court took judicial notice, "as a matter of common knowledge, that some horses shy at traffic and some horses don't." This was entirely proper. A reasonable man is assumed to have such knowledge of the habits of animals as is customary in his community. For instance, he should know that certain objects are likely to frighten horses.[1] It is also a matter of common knowledge, which it may be assumed that he knows, that horses are anxious to return to their stable, particularly at the end of the day; that they are nervous and excitable; and that, even though gentle, many of them fear motorcycles and motor scooters, and as night approaches, even gentle horses may become restless and difficult to handle, particularly when in the hands of an inexperienced rider. The evidence was sufficient to support a finding that at the time of the accident it was either dark or approaching darkness; that the horse Lichtscheidl was riding was nervous and difficult to handle and getting out of hand; that a jury might well find that under all of the evidence, circumstances, and inferences to be drawn therefrom, the defendants deviated from the ordinary standard of care imposed upon them; that they were negligent in that they failed to exercise that degree of care which an ordinarily prudent person would exercise under like or similar circumstances. It is only in those cases where it clearly appears that it would be its manifest duty to set aside a contrary verdict as not justified by the evidence or as contrary to the law applicable to the case that a verdict may be directed.[2]

We are not concerned here with the so-called vicious animal cases in which an owner may be held liable if he neglects to act to prevent risk of damage when he has notice of the vicious propensities of the animal.[3] Nor is the statutory prohibition of animals running at large

---

[1]Restatement, Torts, § 290; 15 R. C. L., Judicial Notice, § 33.

[2]19 Dunnell, Dig. (3 ed.) § 9764.

[3]Harris v. Breezy Point Lodge, Inc. 238 Minn. 322, 56 N. W. (2d) 655; Hagerty v. Radle, 228 Minn. 487, 37 N. W. (2d) 819; Annotation, 15 A. L. R. (2d) 1313.

applicable in the instant case.[4] The question is simply whether the defendants failed to exercise due care under the circumstances. That, in our opinion, presented a jury question. The trial court erred in directing a verdict in favor of the defendants and a new trial is granted.

Reversed.

MR. JUSTICE OTIS, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

[4]See, Minn. St. 346.16; Lackey v. Peterson, 161 Minn. 315, 201 N. W. 428.