******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., with whom VERTEFEUILLE, J., joins, concurring. I agree with the majority that, for reasons of public policy, this court should adopt the rule that "the owner or keeper of a domestic[1] animal has a duty to take reasonable steps to prevent injuries that are foreseeable because the animal belongs to a [species or breed][2] . . . that is naturally inclined to cause such injuries . . . [and that] the owner may be held liable for negligence if he or she fails to take such reasonable steps and an injury results." (Footnotes added.) I do not agree, however, that "the [evidence presented] . . . created a genuine issue of material fact as to whether the . . . injury [sustained by the plaintiff Anthony John Vendrella] was foreseeable because horses have a natural propensity to bite." The natural propensity of horses to nip and bite was recognized by every witness who gave testimony on the subject during the summary judgment proceedings, and, in any event, it is a matter of common knowledge. Accordingly, because courts can take judicial notice of matters of common knowledge, the trial court should take judicial notice of the fact that horses have a natural propensity to nip and bite, and leave for the jury the more limited question of whether the defendants, Astriab Family Limited Partnership and Timothy D. Astriab, in light of this knowledge and their knowledge of Scuppy's[3] past behavior, took reasonable precautions to prevent Scuppy from causing foreseeable harm.

I begin by observing that the present case does not involve a wild animal or a domesticated animal that the owner had reason to know possessed dangerous propensities abnormal to its species. Rather, Scuppy belongs to a species that is not abnormally dangerous. Furthermore, Scuppy never demonstrated any dangerous propensities while in the defendants' possession. Thus, in defining the question that should be submitted to the jury, this court should rely in part for guidance on the Restatement (Second) of Torts, which speaks directly to the liability of an owner in this circumstance. See, e.g., *Allen* v. *Cox*, 285 Conn. 603, 606, 615–17, 942 A.2d 296 (2008) (relying on Restatement [Second] of Torts to determine scope of defendants' liability for injuries caused by their cat).

Section 518 of the Restatement (Second) of Torts provides: "Except for animal trespass, one who possesses or harbors a domestic animal that he does not know or have reason to know to be abnormally dangerous, is subject to liability for harm done by the animal if, but only if . . . (b) he is negligent in failing to prevent the harm." 3 Restatement (Second), Torts § 518, p. 30 (1977).

Comment (e) explains that § 518 "is applicable to

those domestic animals of a class that can be confined to the premises of their keepers or otherwise kept under constant control without seriously affecting their usefulness and which are not abnormally dangerous. Although the utility of these animals is sufficient to justify their being kept without risk of . . . strict liability . . . many of them are recognizably likely to do substantial harm while out of control and, therefore, their keepers are under a duty to exercise reasonable care to have them under a constant and effective control." Id., comment (e), p. 31.

Comment (f) further explains that "[t]he amount of care that the keeper of a domestic animal is required to exercise in its custody is commensurate with the character of the animal." Id., comment (f), p. 31. Comment (g) adds that "the characteristics that are normal to its class are decisive, and one who keeps the animal is required to know the characteristics." Id., comment (g), p. 31.

Finally, in discussing domesticated animals that may become dangerous in particular circumstances, comment (h) provides that "[o]ne who keeps a domestic animal that possesses only those dangerous propensities that are normal to its class is required to know its normal habits and tendencies. He is therefore required to realize that even ordinarily gentle animals are likely to be dangerous under particular circumstances and to exercise reasonable care to prevent foreseeable harm." Id., comment (h), pp. 31–32.

In my view, the natural propensity of horses, which are not abnormally dangerous animals, to nip and bite as a consequence of their naturally inquisitive or playful disposition is so widely known that the trial court should take judicial notice of that fact and limit the question submitted to the jury to whether the defendant took reasonable steps to prevent Scuppy from causing foreseeable harm. "To take judicial notice is a function, and to apply it to the decision of causes a right, which appertains to every court of justice, from the lowest to the highest. . . . The true concept of what is judicially known is that it is something which is already in the court's possession or, at any rate, is so accessible that it is unnecessary and therefore time wasting to require evidence of it. . . . Judicial notice, therefore, in its appropriate field, meets the objective of establishing facts to which the offer of evidence would normally be directed. . . . The underlying theory is that proof by evidence concerning a proposition may be dispensed with where the court is justified, by general considerations, in declaring the truth of the proposition without requiring evidence from the party. . . . This theory goes no further, however, than to mean that the proposition is taken as true without an offer of proof by the party who should ordinarily have offered it. Judicial notice of the proposition is in no sense conclusive,

and the opponent is not prevented from disputing it by evidence if he believes it to be disputable. . . . Matters which may properly be judicially noticed in this way are those which come to the knowledge of men generally in the course of the ordinary experience of life or those matters which are generally accepted by mankind as true and are capable of ready and unquestionable demonstration. . . . Thus, facts may be judicially noticed which are so notorious that the production of evidence would be unnecessary, or which the judicial function supposes the judge to be familiar with, in theory at least, or which, although they are neither notorious nor bound to be judicially known, are capable of such instant and unquestionable demonstration, if desired, that no party would think of imposing a falsity on the tribunal in the face of an intelligent adversary." (Citations omitted; internal quotation marks omitted.) *State* v. *Tomanelli*, 153 Conn. 365, 368–69, 216 A.2d 625 (1966).

This court has further stated that matters of common knowledge on which judicial notice may be taken are limited to "those well substantiated facts that are obvious to the general community." *State* v. *Padua*, 273 Conn. 138, 193, 869 A.2d 192 (2005) (*Katz, J.*, dissenting and concurring). "Although the concept of common knowledge plays a significant role in our jurisprudence, this court never explicitly has defined its meaning. Similarly, despite its universal importance, very few courts outside Connecticut have endeavored to provide a standard by which to determine when a matter rises to the level of common knowledge. . . . The few jurisdictions to do so have cited the definition set forth in various editions of Black's Law Dictionary. . . . According to the [eighth] edition of that dictionary, common knowledge is defined as a '*fact* that is so widely known that a court may accept it as true without proof.' . . . Black's Law Dictionary (8th Ed. 2004).[4] In order for something to be considered a fact, it must, at the very least, generally be accepted as true and have a basis in reality. See id. (defining 'fact' as '[s]omething that actually exists; an aspect of reality'). Therefore, common knowledge is not tantamount to a common belief that may be nothing more than a perception grounded in folklore, not reality." (Citations omitted; emphasis in original; footnote added.) *State* v. *Padua*, supra, 193–94 (*Katz, J.*, dissenting and concurring).

Mindful of these principles, I would conclude that the natural propensity of horses to nip and bite is a matter of common knowledge. Accordingly, the trial court should take judicial notice of this fact and not submit it to the jury.

Taking judicial notice of the habits and characteristics of domestic animals is not unusual. In fact, it has happened quite often in other jurisdictions and has been done in this state, as well. For example, this court noted

in *Baldwin* v. *Ensign*, 49 Conn. 113 (1881), that "[t]he propensity of colts and of horses generally when at liberty in the highway to run and gambol, and to annoy and excite other horses, and their liability to cause damage in various ways, are so well known that they need only be mentioned." Id., 117. The court subsequently added that "the natural playfulness of . . . [colts] may be under some circumstances as dangerous as a positive vice." Id., 118. Thereafter, in *Bischoff* v. *Cheney*, 89 Conn. 1, 92 A. 660 (1914), this court effectively took judicial notice of the fact that cats as a species are harmless when it concluded that "[t]he cat is not of a species of domestic animals naturally inclined to mischief, such as, for example, cattle . . . . The cat's disposition is kindly and docile, and by nature it is one of the most tame and harmless of all domestic animals." Id., 5.

Similarly, the trial court should take judicial notice that horses as a species have a natural propensity to bite because the overwhelming majority of people know from their own experience and from the experience of others, as reported in the media and otherwise, that horses have a natural propensity to nip and bite and may occasionally do so when they come into close contact with humans.

Taking judicial notice of the fact that horses have a natural propensity to nip and bite also is consistent with the decisions of many other jurisdictions that have taken judicial notice of, or described as "a matter of common knowledge," the natural propensities of horses to nip, bite, kick, or engage in other playful, inquisitive, or inadvertent behavior that, due to their sheer size and weight, may be harmful or dangerous to persons in close proximity. See, e.g., *Weaver* v. *National Biscuit Co.*, 125 F.2d 463, 465 (7th Cir. 1942) ("[a]ll men know that a horse which has been stabled and well-fed will, when turned out, run and plunge, and become dangerous in the midst of people; all horses are, when loose, more or less dangerous on sidewalks and streets and all men know this" [internal quotation marks omitted]); *Pool* v. *Clark*, 207 Ark. 635, 637, 182 S.W.2d 217 (1944) ("[i]t is a well-known propensity of livestock, such as horses, cattle, sheep and other domestic animals to graze upon, trample down and destroy grass and other growing crops" [internal quotation marks omitted]); *Cooper* v. *Oregon Short Line Railroad Co.*, 45 Idaho 313, 323, 262 P. 873 (1927) ("The court can take judicial notice of the habits and propensities of animals. . . . It is a matter of common knowledge that horses, strange to each other, frequently fight when brought into close contact. They, when unused to railroad transportation, become restive, excited and frightened in such surroundings." [Citations omitted.]); *Williams* v. *Hawkins*, 304 So. 2d 75, 77 (La. App. 1974) ("[a]llegations of being 'high strung' or 'skittish' and testimony that the horse was acting up could not possibly be interpreted as a

'dangerous propensity [of that particular horse],' especially when considered in light of the common knowledge that a great many horses at times are skittish, high strung, and act up"), appeal denied, 307 So. 2d 373 (La. 1975); *Tamburello* v. *Jaeger*, 176 So. 2d 707, 709 (La. App. 1965) ("It is a matter of common knowledge that all horses have [the] capacity [to cause injury by kicking]; and there are certain inherent dangers in handling horses, such as being stepped on while currying, feeding, harnessing, or while preparing to mount. There is the danger of being kicked or otherwise injured by a horse subjected to sudden excitement or fear; the danger of being kicked or bitten when one disturbs a horse while eating. It is also a matter of common knowledge that some horses are by nature more gentle or more nervous or fearful than others. In other words . . . horses have certain characteristics in common . . . ."), aff'd, 249 La. 25, 184 So. 2d 544 (1966); *Simonds* v. *Maine Telephone & Telegraph Co.*, 104 Me. 440, 442, 72 A. 175 (1908) ("[i]t is common knowledge that all horses . . . are liable to be frightened by any unaccustomed . . . appearances and noises in unaccustomed situations; that they are susceptible to fright from the most trivial things; that their vagaries are unforeseeable; and that it is practically impossible to guard against them"); *Fraumeni* v. *Aleppo Temple Shriners Activities, Inc.*, Massachusetts Superior Court, Docket No. 950204 (Mass. Super. April 23, 1997) ("It is [common knowledge and] uncontroverted that horses have a natural dangerous propensity without regard to conditioning or training. [The plaintiff] himself asserted that even with the proper care, horses have a propensity to buck and that 'you can never depend on them.' "); *Rosenthal* v. *Hill Top Riding Academy, Inc.*, 261 Minn. 88, 92, 110 N.W.2d 854 (1961) (It was entirely proper that "[t]he trial court took judicial notice, 'as a matter of common knowledge, that some horses shy at traffic and some horses don't.' . . . A reasonable man is assumed to have such knowledge of the habits of animals as is customary in his community. For instance, he should know that certain objects are likely to frighten horses. It is also a matter of common knowledge, which it may be assumed that he knows, that horses are anxious to return to their stable, particularly at the end of the day; that they are nervous and excitable; and that, even though gentle, many of them fear motorcycles and motor scooters, and as night approaches, even gentle horses may become restless and difficult to handle, particularly when in the hands of an inexperienced rider." [Footnote omitted.]); *Crosby* v. *Burge*, 190 Miss. 739, 748, 1 So. 2d 504 (1941) ("courts . . . take judicial notice of the character and habits of domestic animals . . . [and] [i]t is common knowledge that any horse, regardless of how gentle he may be, is likely to jump or lunge forward when his companion animal [in a plowing team] falls or hits against him from a three or four foot embankment" [citation omitted; internal

quotation marks omitted]); *Bracken* v. *Bruce*, 190 N.J. Super. 146, 152, 462 A.2d 201 (App. Div. 1983) ("[I]t appears to us within common knowledge that most animals . . . might be startled by . . . sudden, unexpected noises. . . . The excitability of horses [being ridden on a highway with cars] is, therefore, a proper subject of judicial notice . . . ." [Citations omitted.]); *Padilla* v. *Winsor*, 67 N.M. 267, 273, 354 P.2d 740 (1960) (taking judicial notice of fact that "horses no matter how gentle, with slight provocation, or without any known provocation, will sometimes shy, jump or even start to buck"); *Hommel* v. *Benshoff*, 178 Misc. 2d 1038, 1041, 682 N.Y.S.2d 546 (1998) ("It is a matter of common knowledge that one of the central dangers to all participants in sporting activities involving horses is the strength and unpredictability of the animals themselves. . . . Thus, for all who work closely with horses—even if not direct participants in the sport itself—there is an elevated risk of injury . . . . [T]here is no dispute that a horse is a powerful and sometimes unpredictable animal . . . ." [Citations omitted.]); *Settlemeyer* v. *Southern Railway Co.*, 91 S.C. 147, 150, 74 S.E. 137 (1912) (it is common knowledge that "horses [are] excited and frightened by the odor of wild animals"); *Blaha* v. *Stuard*, 640 N.W.2d 85, 88 (S.D. 2002) ("[i]t is common knowledge that horses buck"); *Jarvis* v. *Koss*, 139 Vt. 254, 255, 427 A.2d 364 (1981) ("[t]he habits and qualities of common animals . . . are matters of common knowledge and a proper subject for judicial notice"). But see *Leipske* v. *Guenther*, 7 Wis. 2d 86, 91, 95 N.W.2d 774, 96 N.W.2d 821 (1959) ("there is no evidence that it is a natural propensity of horses to bite people, and we are not prepared to take judicial notice of such a propensity").

Similarly, the evidence was undisputed in the present case that horses have a natural propensity to nip and bite. All of the witnesses on both sides who gave deposition testimony on the behavior of horses during the summary judgment proceedings acknowledged this propensity. Bradley W. Amery, a doctor of veterinary medicine whose affidavit was filed in support of the plaintiffs' opposition to the summary judgment motion, gave a detailed and lengthy explanation as to why this is the case. *Vendrella* v. *Astriab Family Ltd. Partnership*, 133 Conn. App. 630, 635, 635–36 n.10, 36 A.3d 707 (2012). Amery explained that he was "very familiar with . . . horses and . . . uniquely familiar with the propensities of horses to bite. . . . Biting is a natural part of horses' lives and horses can bite for many reasons. Anatomically the horse has his eye located laterally on his head. While this provides a near 350 degree range of vision it does mean that there are two blind spots. These are directly in front of the horse's nose for approximately 3-4 feet, and directly behind the head creating a 10 degree blind spot behind the horse. This means that the horse doesn't see what he is grabbing and is reliant

on the sensory input from his mouth. While the nervous system is fast it is unable to process all that information before the bite has occurred. Biting is also a common form of mutual grooming. Horses will usually stand facing opposite directions and use their teeth to both scratch and bite the other horse's back, neck and withers. This behavior can be easily replicated by a human scratching a horse's withers. Nipping is a term that is often applied to horses attracting attention. This behavior is generally believed to be the result of hand feeding treats. However, this behavior can be created by any form of positive reinforcement (like scratching their muzzle, or head, patting their neck or even verbal rewards) [and] [t]his nipping behavior can escalate if the [person's] attention is not on the horse to a full bite. . . . [M]ost of the bites are not the result of aggressive . . . or nasty horses. They occur when the horse is being groomed, tacked up, being [hand-fed] treats, or in pain." (Internal quotation marks omitted.) Id., 635–36 n.10.

In other deposition testimony, Milford Animal Control Officer Richard George agreed with the statement that "a horse doesn't have to have a tendency to bite in order to bite" and that he himself had been bitten by horses in the past. Captain Bernard L. Begley, Jr., of the Milford Fire Department similarly testified in support of the plaintiffs' opposition that he had been riding horses "all of [his] life," that "a horse [could] bite at any time," and that "[t]hey have all been doing it . . . since the beginning of time, biting and kicking." (Internal quotation marks omitted.) *Vendrella* v. *Astriab Family Ltd. Partnership*, supra, 133 Conn. App. 636. Begley further stated that he always was careful when feeding horses and that he "never put [his] fingers anywhere near the mouth of a horse." (Internal quotation marks omitted.) Id. Begley also opined that "a horse's propensity to bite is part of its nature." Id.

The defendant Astriab concurred with these assessments. In his deposition testimony, Astriab "acknowledged that a horse, by its very nature, could harm a person who attempts to pet or feed [it], stating that 'a horse could bite you and cause great physical damage.' He further acknowledged that he understood that even though a horse does not display a propensity to bite another person, horses by their nature could bite a person. He testified, based on his experience, that he was 'well aware' that horses can bite people.

"Astriab also . . . repeatedly described Scuppy as a 'typical horse.' When asked if Scuppy was different from other horses that would bite if a finger was put in front of him, Astriab answered, '[n]o.' He acknowledged his concern that if someone made contact with Scuppy, whether to pet or feed him, he or she could get bit. When asked whether 'a person who doesn't know Scuppy . . . can go up to Scuppy, put [his] hand out

and the horse, being a horse, could bite that person,'
Astriab answered, '[y]es.'" Id., 636–37.

The fact that the plaintiffs' witnesses *and* the defendant Astriab gave consistent testimony regarding the natural propensity of horses to nip and bite—not because they are abnormally dangerous animals but because of their inherent disposition to engage in such behavior—supports the conclusion that it is a matter of common knowledge that horses as a species have a natural propensity to bite. Accordingly, the trial court should take judicial notice of this characteristic and limit the question submitted to the jury to whether the defendants, given this knowledge and their knowledge of Scuppy's past behavior, took reasonable precautions to prevent Scuppy from causing foreseeable harm.

The majority acknowledges that judicial notice has been taken of the natural propensities of animals in past cases and that the court in *Bischoff* "effectively took judicial notice of the fact that cats as a species are harmless," but states that, "[i]f the question of cats' naturally mischievous propensities had come before this court as a matter of first impression today, we might have applied the more flexible approach that we adopt in this opinion and have left that determination to the jury on a case-by-case basis." Footnote 24 of the majority opinion. The majority explains that, "when reasonable minds could differ as to whether a particular harm was foreseeable, the issue is one for the jury. . . . Thus . . . *if a plaintiff can prove that an injury by a domestic animal was foreseeable because the animal belonged to a class with naturally mischievous propensities*, the owner or keeper of the animal has a duty to take reasonable steps to prevent foreseeable harm. In any given case, the existence of this duty will depend on proof that the harm was foreseeable, which is a question of fact for the trier of facts."[5] (Citations omitted; emphasis in original.) Footnote 6 of the majority opinion.

I disagree. Asking a jury to decide whether a particular *species* of domesticated animal has a natural propensity to engage in potentially harmful behavior makes no sense. First, the natural propensities of a species are, by definition, fixed, which means that they are an essential part of the animal's nature. Thus, to the extent reasonable minds can differ as to whether a natural propensity exists, it means that common experience and the current state of scientific knowledge are insufficient to justify the application of a legal standard that charges the owner of an animal with such knowledge. In these cases, all guesswork should be eliminated, and the legal standard that should be applied to determine an owner's negligence should be based on the owner's knowledge of the propensities of the animal in question.

Second, and closely related, if reasonable minds can differ as to whether such a propensity exists, an owner

*never* can be charged with knowledge and with the obligation to protect against the potentially harmful consequences of the animal's behavior because he reasonably may believe that the propensity does not exist.

Third, if reasonable minds can differ, defendants will not be judged under the same legal standard in identical circumstances because juries may reach differing conclusions as to whether the propensity is natural to the species and whether the defendant should be charged with knowledge that it exists. This is not only unfair to owners charged with negligence, whose fate will depend on the "luck of the draw" and the subjective opinions of the jury members, but will lead to confusion regarding the future liability of animal owners under Connecticut's negligence law and to disputes as to whether there was sufficient notice of the animal's propensity to engage in the harmful behavior.

Owners must have notice of their potential liability for an animal's harmful behavior so that they will be encouraged to take proper precautions. For example, if this court were to take judicial notice of the natural propensity of horses to nip and bite, owners would know not only that they must protect against harm due to the unique characteristics of a particular horse, but that they also must take steps to protect against foreseeable harm that might arise from the general propensity of horses to nip and bite. Such steps might consist of posting warning signs, building fences, or otherwise separating their horses from persons with whom they should not come into contact.

None of the cases cited by the majority suggests that the question of whether a domesticated animal has a natural propensity to engage in harmful behavior should be submitted to the jury.[6] See footnote 22 of the majority opinion. Rather, most of the cases state that the owner or keeper "*is assumed to know* the animal's general propensities"; (emphasis added; internal quotation marks omitted) *Humphries* v. *Rice*, 600 So. 2d 975, 978 (Ala. 1992); thus indicating that the only question the jury must decide is whether the owner took appropriate steps to prevent foreseeable harm. See, e.g., *Groh* v. *Hasencamp*, 407 So. 2d 949, 952 (Fla. App. 1981) ("[t]he *owner or keeper of a domestic animal is bound to take notice of the general propensities of the class to which it belongs*, and also of any particular propensities peculiar to the animal itself of which he has knowledge or is put on notice; and in so far as such propensities are of a nature likely to cause injury he must exercise reasonable care to guard against them and to prevent injuries which are reasonably to be anticipated from them" [emphasis added; internal quotation marks omitted]), review denied, 415 So. 2d 1360 (Fla. 1982); *Farrior* v. *Payton*, 57 Haw. 620, 630, 562 P.2d 779 (1977) ("[t]he owner or keeper of a domestic animal is *bound to take notice of the general propensities of the class to which*

*it belongs* . . . and insofar as such propensities are of a nature likely to cause injury he must exercise reasonable care to guard against them and to prevent injuries which are reasonably to be anticipated from them" [emphasis added; internal quotation marks omitted]); *Ross* v. *Lowe*, 619 N.E.2d 911, 914 (Ind. 1993) ("the owner of a dog is *bound to know the natural propensities of dogs*, and if these propensities are [of] the kind which reasonably might be expected to cause injury, the owner must use reasonable care to prevent such injuries from occurring" [emphasis added]); *Huber* v. *Timmons*, 184 Neb. 718, 722, 171 N.W.2d 794 (1969) ("Even in the absence of any known viciousness in a domestic animal, its owner is obliged to exercise over it a certain degree of care depending upon the kind and character of the particular animal concerned, the circumstances in which it is placed, and the purposes for which it is employed or kept. *The owner* . . . *is charged with knowledge of the natural propensities of animals* . . . and, if these propensities are of the kind that might cause injury he must exercise the care necessary to prevent such injuries as may be anticipated." [Emphasis added; internal quotation marks omitted.]); *Griner* v. *Smith*, 43 N.C. App. 400, 407, 259 S.E.2d 383 (1979) ("[t]he *owner of a domestic animal is chargeable with knowledge of the general propensities* of certain animals and he must exercise due care to prevent injury from reasonably anticipated conduct," even in absence of evidence that animal had known vicious propensities [emphasis added]). Indeed, after the court in *Huber* v. *Timmons*, supra, 721, observed that horses have a natural propensity to rear or bolt when frightened and that a person riding a horse for hire must take this propensity into account, it concluded that the only question that should have been presented to the jury was "whether . . . [the] defendants were negligent in entrusting the pony [on which the child was riding] to [the inexperienced handler's] care." Id., 722.

In the present case, I would conclude that it is a matter of common knowledge that horses as a species have a natural propensity to nip and bite and that, to the extent the majority believes that evidence is required to support this conclusion, it has been provided by the uncontroverted testimony of all of the witnesses in this case who testified about the general disposition and behavior of horses. Accordingly, the majority should not conclude, in light of the evidence in this case, that the natural propensity of horses to bite is a genuine issue of material fact that must be submitted to the jury. Rather, the jury should be asked to determine whether, given the fact that horses as a species have a natural propensity to bite and given the defendants' knowledge of Scuppy's past behavior, the defendants took appropriate measures to prevent Scuppy from causing foreseeable harm.

For the foregoing reasons, I respectfully concur in

the judgment.

[1] A "domestic animal" is defined in the Restatement (Second) of Torts as "an animal that is by custom devoted to the service of mankind at the time and in the place in which it is kept." 3 Restatement (Second), Torts § 506 (2), p. 10.

[2] The majority describes horses as a "class" of animals, but horses are a species within the class of "mammals . . . ." *Sykes* v. *Commissioner of Internal Revenue*, 57 T.C. 618, 626 (1972).

[3] Scuppy is the name of the horse that bit Anthony John Vandrella.

[4] The ninth, and most recent, edition of Black's Law Dictionary retains this definition of "common knowledge," as well as the eighth edition's definition of "fact." Black's Law Dictionary (9th Ed. 2009).

[5] The majority essentially says the same thing in a different part of its opinion when it states that, "if a plaintiff presents evidence that it was reasonably foreseeable that a horse would be dangerous under the particular facts and circumstances of the case, and reasonable minds could differ on that question, the issue is one for the trier of facts." Footnote 22 of the majority opinion.

[6] The majority responds in a footnote that "the court in *Dolezal* v. *Carbrey*, [161 Ariz. 365, 370, 778 P.2d 1261 (App. 1989)], concluded that the questions of whether 'an otherwise gentle horse might bolt in reaction to out-of-the-ordinary cues' and whether 'an inexperienced rider on a runaway horse could be harmed in some manner' were questions for the jury because reasonable minds could reach different conclusions on those questions." Footnote 25 of the majority opinion. The majority also claims that the natural propensity of horses to bite is not a matter of common knowledge in contemporary society because horses are not a daily presence in most people's lives, and that different types of horses may have a more or less pronounced propensity to engage in biting behavior, thus justifying submission of propensity questions to the jury. See id. I disagree.

First, insofar as the majority relies on *Dolezal*, that case is unpersuasive. The question in *Dolezal* was not whether the horse had a natural propensity to bolt that the owner should have foreseen but whether it was foreseeable that a show horse *trained to respond to subtle cues* might unexpectedly bolt when the novice rider's "legs were flapping during her ride and . . . she jabbed the horse with one foot and dragged her heel across the horse's back when she attempted to dismount." *Dolezal* v. *Carbrey*, supra, 161 Ariz. 370. In this context, which did not require the jury to consider the natural propensities of horses but the qualities instilled in the particular horse because of its special training, the court concluded that "[r]easonable minds could differ whether it is foreseeable that an otherwise gentle horse might bolt in reaction to *out-of-the-ordinary cues*. Taking this one step further, [the court] also believe[s] that reasonable minds could conclude that it is foreseeable that an inexperienced rider on a runaway horse could be harmed in some manner." (Emphasis added.) Id. The court thus determined that resolving the question of negligence required an examination of the *owner's conduct*, such as whether he should have allowed an inexperienced rider on the horse, whether he instructed the rider properly, and whether he sufficiently supervised her ride and dismount. Id., 370–71.

Second, the fact that horses are not a daily presence in people's lives does not mean that it is not common knowledge that they have a natural propensity to nip and bite. Bulls are not a daily presence in people's lives, but it is common knowledge that they have a natural propensity to engage in behavior that causes harm to others if they are not sufficiently controlled. See 3 Restatement (Second), supra, § 518, comment (g), p. 31 ("the keeper of a bull . . . is required to take greater precautions to confine it to the land on which it is kept and to keep it under effective control when it is taken from the land than would be required of the keeper of a cow or gelding"). Similarly, it is common knowledge that domesticated horses, although not naturally dangerous animals, have certain potentially harmful propensities, including bucking, biting, and kicking, because people are constantly exposed to horses by way of books, television, movies, computer games, parades, and a wide variety of recreational activities. Accordingly, one need not have direct contact with horses to have knowledge of their general propensities in our media-saturated world.

Third, to the extent the propensities of an animal may not be common knowledge because the animal belongs to a subspecies with characteristics that distinguish it from other members of the species, that issue has not been raised. The issue before the court is whether the owner of a horse had a duty to take reasonable steps to prevent the horse from causing

foreseeable harm because horses as a species are naturally inclined to engage in the type of conduct that caused Anthony John Vendrella's injuries. As previously noted, Astriab described Scuppy as a "typical horse" who would react no differently from other horses when in close contact with people who might approach to pet or feed him. Thus, to the extent the majority considers how the issue of duty should be resolved when an animal is a member of a subspecies with characteristics that differ from other members of the species, or when a particular animal has known mischievous propensities that might result in foreseeable harm, its reasoning has no relevance to the issue in the present case.

———————————————